UNITED STATES of America, Plaintiff,

v.

Kevin DIMECK and Benjamin
Salcido, Defendants.

No. 92–20037–01.

United States District Court,
D. Kansas.

March 1, 1993.

1426

Leon J. Patton, Asst. U.S. Atty., for U.S.

Mark L. Bennett, Jr., Wilburn Dillon, Jr., Bennett & Dillon, Topeka, KS, James W. Burdick, Bloomfield Hills, MI, for Kevin Dimeck.

Michael Harris, Asst. Federal Public Defender, Kansas City, KS, for Benjamin Salcido.

## MEMORANDUM AND ORDER

EARL E. O'CONNOR, Senior District Judge.

This matter is before the court on motions by defendant Kevin Dimeck (Doc. # 150) and defendant Benjamin Salcido (Doc. # 151) for judgment of acquittal. The court has considered the briefs presented by both defendants and by the government and has heard oral argument on these motions at a hearing on February 26, 1993. For the reasons set forth below, the separate motions will be denied.

■ Both defendants seek a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29. In considering motions for judgment of acquittal, we must "view the evidence in the light most favorable to the government and then determine whether there is sufficient evidence from which a jury might properly find the accused guilty beyond a reasonable doubt." *United States v. White*, 673 F.2d 299, 301 (10th Cir.1982). In rendering its verdict, the jury was entitled to consider both direct and circumstantial evidence, as well as all reason-

able inferences that could be drawn therefrom. *United States v. Hooks*, 780 F.2d 1526, 1531 (10th Cir.), *cert. denied*, 475 U.S. 1128, 106 S.Ct. 1657, 90 L.Ed.2d 199 (1986). In considering a motion for judgment of acquittal, we are prohibited from weighing conflicting evidence or considering the credibility of any witnesses. *Burks v. United States*, 437 U.S. 1, 16, 98 S.Ct. 2141, 2150, 57 L.Ed.2d 1 (1978). We may grant the defendants' motions for judgment of acquittal only if "the evidence is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *White*, 673 F.2d at 301.

### The Substantive Money Laundering Offense—Count 2

■ Defendant Salcido was convicted of one count of money laundering in violation of section 1956(a)(3)(B), which imposes criminal sanctions upon:

(3) Whoever, with the intent—

... (B) to conceal or disguise the nature, location, source, ownership, or control of property believed to be the proceeds of specified unlawful activity; ...

conducts or attempts to conduct a financial transaction involving property represented by a law enforcement officer to be the proceeds of specified unlawful activity....

18 U.S.C. § 1956(a)(3)(B).

Salcido first alleges that the government failed to prove a violation of section 1956(a)(3)(B) because the government did not present evidence of a "financial transaction" as defined in section 1956(c)(4). We disagree.

"Financial transaction" is defined as "a transaction[1] involving the *movement of funds by* wire or *other means* or involving one or more monetary instruments,[2] which in any way or degree affects interstate or foreign commerce." 18 U.S.C. § 1956(c)(4) (em-

---

1. Transaction is broadly defined to include "purchase, sale, loan, pledge, gift, *transfer, delivery, or other disposition."* 18 U.S.C. § 1956(c)(3) (emphasis added).

2. "Monetary instrument" is defined in 18 U.S.C. § 1956(c)(5) as:

"coin or currency of the United States or of any other country, travelers' checks, personal checks, bank checks, money orders, investment securities in bearer form or otherwise in such form that title thereto passes upon delivery, and negotiable instruments in bearer form or otherwise in such form that title thereto passes upon delivery."

phasis added). Thus, a financial transaction under section 1956(c)(4) can be a transfer or delivery involving the movement of funds by means other than wire which in any way affects interstate commerce. This is precisely the type of transaction Salcido attempted here.

The government presented evidence that Salcido travelled from Detroit to Kansas, that he discussed the nature and source of the money with Rich Moore (a cooperating individual or "CI"), that he directed Moore to get large bills, that he called Pruneda, that he went with Moore to pick up the "money" and waited while Moore went inside after the "money," that he took possession of the "money" from Moore, and that he planned to carry the money upon his person on a plane to California and deliver it to Pruneda. Reviewing this evidence in the light most favorable to the government, we hold that the jury could have reasonably inferred that Salcido intended to pick up money that he believed to be proceeds from a specified unlawful activity and to transport it to Pruneda in California with the intent to conceal or disguise the nature, source, or ownership of the money by eliminating any paper trail of the transfer.

■ Salcido urges that the use of the term "financial transaction" in section 1956(a)(3)(B) restricts the scope of the statute to transactions involving monetary instruments and thus contends that he cannot be guilty because the bag he received from Moore contained only pieces of paper and no monetary instrument was involved.[3] In short, Salcido claims it was legally impossible for him to have attempted a financial trans-

action in violation of the money laundering statute.

We cannot agree. Salcido's interpretation of section 1956(a)(3) ignores the plain language of the rest of section 1956, as well as the legislative history of section 1956(a)(3). The definition of financial transaction encompasses the movement of funds by means other than wire, as well as transactions involving monetary instruments. *See* 18 U.S.C. § 1956(c)(4). In addition, section 1956(a)(3) expressly contemplates an attempt to conduct a financial transaction in the context of a sting operation. The most logical interpretation of section 1956(a)(3) is not that "financial transaction" was intended to exclude transactions which did not involve monetary instruments.[4] Rather, we believe Congress intended that section 1956(a)(3) apply to the very situation presented by this case—a sting operation in which the property involved was not *in fact* proceeds (as required in section 1956(a)(1)),[5] but rather, was property *represented and believed by the defendant to be* proceeds.

The legislative history of section 1956(a)(3) bolsters our conclusion. Senator Biden, chairman of the Judiciary Committee and proponent of section 1956(a)(3) as an amendment to section 1956, addressed the differences between section 1956(a)(1) and section 1956(a)(3) as follows, "the present statute does not provide for such operations because it permits a conviction only where the laundered money 'in fact involved proceeds of specified unlawful activity.'" 134 Congr.Rec. S17360, 17365 (Nov. 10, 1988). Section 1956(a)(3) was added to "permit undercover law enforcement officers to pose as drug traffickers in order to obtain evidence necessary to convict money launderers." *Id.*

---

3. We do not find the defendant's analogy to an exchange of diamonds or gold bouillon persuasive. In this case, the subject matter of the transaction was represented (and believed by Salcido) to be drug proceeds in the form of United States currency which is both funds as required by § 1956(c)(4) and a monetary instrument under § 1956(c)(5).

4. Surely, Congress did not intend the outcome of this case would be different if the bag had been full of paper but had contained one penny in United States currency.

5. Section 1956(a)(1) provides in part:

Whoever, knowing that property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which *in fact* involves the proceeds of specified unlawful activity ...

(B) knowing that the transaction is designed in whole or in part—

(i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity shall be sentenced ...

18 U.S.C. § 1956(a)(1)(B)(i) (emphasis added).

We find Salcido's analysis of attempt under section 1956(a)(3)(B) similarly unpersuasive. Defendant contends that "attempt" was included in section 1956(a)(3)(B) only to. address incomplete transactions. In support, he relies on *United States v. Loehr*, 966 F.2d 201 (6th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 655, 121 L.Ed.2d 582 (1992). In *Loehr*, the defendant was a car salesman who accepted cash, represented to him by undercover agents to be drug proceeds, for the purchase of a car. *Id.* at 202. Although the transaction was never fully completed, the defendant was arrested and convicted for attempted money laundering. *Id.* at 202–03. In this context, the court discussed the requirements of prosecution for attempt under section 1956(a)(3)(B) and concluded that the government was not required to prove a completed transaction to sustain a conviction for attempt. *Id.* at 203. From this, Salcido reasons that he is not guilty of attempted money laundering because the transaction here was complete. Yet, he claims that, even fully completed, the transaction here could not form the basis for a conviction under section 1956(a)(3)(B) because it is impossible to violate section 1956(a)(3)(B) unless a monetary instrument is involved. Salcido concludes that his intent is irrelevant.

However, this is not a case of legal impossibility where, regardless of intent, a defendant's actions "even if fully carried out as [the defendant] desires would not constitute a crime." *United States v. Conway*, 507 F.2d 1047, 1050 (5th Cir.1975). If Salcido's actions had been fully carried out as *he* planned, he would have violated section 1956(a)(1)(B)(i) of the money laundering statute. As it was, this was factually impossible because circumstances unknown to him prevented him from completing the crime he set out to commit. This does not, however, prevent him from violating section 1956(a)(3)(B) because, if so, section 1956(a)(3) is meaningless. No defendant intends to get caught by a sting operation.

■ We conclude that impossibility is not a defense in the instant case. As the court in *United States v. Parramore*, 720 F.Supp. 799 (N.D.Cal.1989) (a § 1956(a)(2) money laundering case), recognized, section 1956(a)(3) was enacted to eliminate the impossibility defense. In addition, the Tenth Circuit has held, "Factual impossibility may fall away as a defense to an attempt charge when adequate proof of intent to commit a specific crime exists ... Evidence of intent may be coupled with proof of a defendant's acts which stamp his conduct as criminal in nature." *United States v. Johnson*, 767 F.2d 673, 675 (10th Cir.1985) (citing *Conway*, 507 F.2d at 1050).

Defendant contends that *Johnson* implicitly recognized factual impossibility as a defense. This may be true in cases where a defendant's acts are commonplace and not sufficiently unique to evidence an intent to commit a criminal act. However, in this case, the defendant's acts were not commonplace and were sufficiently suspect to "stamp his conduct as criminal in nature." *Johnson* at 675 (citing *United States v. Oviedo*, 525 F.2d 881, 885 (5th Cir.1976)). Picking up $58,000 in cash and carrying the money in large bills across the country on one's person are not commonplace activities frequently carried on by those who legally transfer money in ordinary business transactions.

Salcido also argues that the government failed to present evidence of an intent to conceal or disguise the nature, location, source, ownership, or control of the property. Salcido claims that because there was no use of code names or third parties, there was no evidence that he intended to conduct a financial transaction designed to conceal. Salcido's analysis misses the point—Salcido *was* the third party in this transaction. The covert nature of the defendant's own actions were enough to circumstantially establish an intent to conceal. If this were not the defendant's intent, the money could have been transferred much more easily by use of wire, check, or some other financial instrument.

■ Finally, we believe that our holding is in accord with *United States v. Johnson*, 971 F.2d 562 (10th Cir.1992), *United States v. Edgmon*, 952 F.2d 1206 (10th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 3037, 120 L.Ed.2d 906 (1992), and *United States v. Sanders*, 928 F.2d 940 (10th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 142, 116 L.Ed.2d 109 (1991), which define the limits of

section 1956. The money laundering statute is not a money spending statute. *Sanders,* 928 F.2d at 946. Rather, section 1956 was "intended to be a separate crime distinct from the underlying offense that generated the money" and was enacted to address "post-crime hiding of the illgotten gains." *Edgmon,* 952 F.2d at 1213. Thus, section 1956 is not to be used as an alternative means of punishing the prior "specified unlawful activity." *Id.* at 1214. In the present case, Salcido is not charged with the underlying unlawful activity, but rather, with attempting to launder what he believed to be proceeds from that activity. The underlying drug transaction had long since been completed; this was not merely the culmination of a conspiracy to sell marijuana. Salcido's actions were designed to "hide the illgotten gains" from prior criminal activity from detection by law enforcement authorities.

We recognize that this case does not present the typical money laundering scenario.[6] However, we believe the broad language of the money laundering statute reaches beyond those limited circumstances. *See United States v. Lovett,* 964 F.2d 1029, 1034 n. 3 (10th Cir.), *cert. denied,* — U.S. —, 113 S.Ct. 169, 121 L.Ed.2d 117 (1992). Thus, we conclude that section 1956(a)(3)(B) reaches Salcido's actions, which were designed to accomplish the same goal as typical money laundering transactions, i.e., to deliver illegitimate money to Pruneda without detection by law enforcement authorities so that Pruneda could enjoy the benefits of the illegal proceeds. The jury's verdict on Count 2 was supported by both the evidence and gov-

erning law. Accordingly, the verdict will not be disturbed.

## *The Conspiracy*

■ Both defendants were charged in Count 1 with conspiracy under 18 U.S.C. § 371 to violate section 1956(a)(1)(B)(i). To prove conspiracy, the government was required to show by direct or circumstantial evidence: 1) an agreement between at least two conspirators to break the law;[7] 2) an overt act done in furtherance of the conspiracy; and 3) willful participation in the conspiracy by the defendants. *United States v. Guadalupe,* 979 F.2d 790, 793 (10th Cir. 1992). Thus, in this case, to show a conspiracy to violate section 1956(a)(1)(B)(i), the government was required to establish: 1) an agreement between at least two persons to conduct a financial transaction; 2) that the conspirators knew that the property involved represented proceeds from a specified unlawful activity; 3) that such proceeds were in fact involved; and 4) that the conspirators intended the transaction to conceal or disguise the nature, location, source, ownership or control of the proceeds.[8]

The indictment charges a conspiracy commencing on or about January 6, 1992, the day on which Arnoldo Pruneda asked Richard Moore to pick up a package containing proceeds from a previous marijuana delivery in Detroit, Michigan. Moore contacted the DEA and went to Detroit as a confidential informant. On January 10, 1992, a person alleged to be defendant Dimeck delivered a paper box containing $60,000 in cash to Moore at Moore's hotel room.

---

6. The typical § 1956 violation is a commercial transaction involving a cash purchase using another identity or a third party to execute the purchase so that the real purchaser may disguise illegal money as a legitimate asset and thereby enjoy the benefits of the illegal money. *See United States v. Lovett,* 964 F.2d 1029, 1032–1038 (10th Cir.), *cert. denied,* — U.S. —, 113 S.Ct. 169, 121 L.Ed.2d 117 (1992).

7. We note that Moore, as the confidential informant, lacks capacity to serve as the second party to the conspiracy agreement. *United States v. Barboa,* 777 F.2d 1420, 1422 (10th Cir.1985) ("[T]here can be no indictable conspiracy involving only the defendant and government agents or informers.").

8. The defendants claim that they should have been charged under § 1956(a)(1)(A)(i) for promoting illegal activity. They then conclude, based on *United States v. Jackson,* 935 F.2d 832, 842 (7th Cir.1991) ("[O]nly in the unusual case will the government be able to prove that a single transaction was intended to both promote an illegal activity *and* conceal the origin of the funds used in that activity."), that they may not now be convicted under § 1956(a)(1)(B)(i). However, we are only called upon here to determine the validity of the charges actually brought in this case—conspiracy to violate § 1956(a)(1)(B)(i). Thus, we need not decide whether charges under § 1956(a)(1)(A)(i) would have been more appropriate.

Moore turned the money over to the DEA but told Pruneda that the money had been seized by police during a traffic stop. Pruneda advised Moore to lie to police to recover the money. When Moore told Pruneda that the money had been returned to him by police, Pruneda set up "Ben" to come after the money. Moore called Ben at Pruneda's request and Ben requested that Moore deliver the money to him in large bills.

On April 25, 1992, defendant Benjamin Salcido arrived in Kansas City to retrieve the money from Moore and transport it to Pruneda in California. Moore met Salcido at the airport. Salcido confirmed that the money would be in large bills. Salcido also stated that he liked to travel alone so that there was only one "story." Salcido called Pruneda and confirmed that Moore was to keep $2,000 of the money. Moore eventually delivered to Salcido a bank bag which Moore indicated contained the money. Salcido acknowledged as much and accepted the bag from Moore.

Both defendants claim that the government did not present evidence of an agreement to conduct a financial transaction entered into with the intent to conceal the nature, source, location, or ownership of the proceeds to which either of them was a party. They contend that on January 6, 1992, there was no evidence of an agreement between Pruneda and anyone but Moore. They further claim that the first evidence of intent to conceal came when Pruneda advised Moore to lie to police to get the money back. This evidence, they reason, cannot form the basis for the necessary agreement to conceal because it occurred well after the alleged conspiracy began.

■ However, the government presented evidence from which the jury could reasonably infer that Pruneda was in contact with someone in the Detroit area who was to deliver the money in cash to Moore so that he could transport it to Pruneda in California. The conspiratorial agreement "may be inferred from the facts and circumstances of the case, and 'need not take any particular form.'" *United States v. Dumas*, 688 F.2d 84, 86 (10th Cir.1982) (quoting *United States v. Butler*, 494 F.2d 1246, 1249 (10th Cir.

1974)). However, there "must at some point be a meeting of the minds in the common design, purpose, or objects of the conspiracy." *Butler*, 494 F.2d at 1249. The very nature of the agreement between Pruneda and the unnamed conspirator—an agreement to conduct a transaction by transporting, or causing to be transported, a large amount of cash (which was proceeds from illegal activities) from Detroit to California—revealed a common design to conceal the source, nature, or ownership of the money being transported. We, therefore, conclude that the agreement between Pruneda and the unnamed conspirator was sufficient to establish the existence of a conspiracy to violate section 1956(a)(1)(B)(i).

■ Once formed, Dimeck and Salcido could join the conspiracy at any point; the law does not require that either Dimeck or Salcido were a party to the original conspiratorial agreement. *See United States v. Pilling*, 721 F.2d 286 (10th Cir.1983). "The connection of the defendant to the conspiracy need only be slight, if there is sufficient evidence to establish that connection beyond a reasonable doubt." *United States v. Mendoza–Salgado*, 964 F.2d 993, 1006 (10th Cir. 1992) (citing *United States v. Savaiano*, 843 F.2d 1280, 1294 (10th Cir.1988)). A defendant who serves as an integral link in the illegal transaction may be convicted of conspiracy even though he plays only a limited role in the illegal activity. *Mendoza–Salgado*, 964 F.2d at 1005–06.

However, the defendants must have done more than merely have known about, approved of, or acquiesced in the object or purpose of the conspiracy—they must have agreed to "cooperate in achieving such object or purpose." *Butler*, 494 F.2d at 1249. In a close case, the Tenth Circuit in *United States v. Lopez*, 576 F.2d 840, 844 (10th Cir.1978), affirmed the defendant's conviction. The court held that where there is uncontradicted evidence that the defendant actually committed an overt act in furtherance of the conspiracy, the evidence was not equally as consistent with guilt as innocence and the government had met its burden of proof beyond a reasonable doubt. *Id.*

The present case is analogous. The uncontradicted evidence was that Salcido came to Kansas to pick up the money and transport it (on his person in one hundred dollar bills) to Pruneda. This overt act alone is enough to establish an agreement by Salcido to knowingly participate in the conspiracy.

▪ Dimeck also claims that there was insufficient evidence that he willfully participated in the conspiracy or had knowledge of the illegal nature of the proceeds involved in the delivery. Circumstantial evidence is sufficient to convict a defendant for willful participation in a conspiracy. *United States v. Troutman*, 814 F.2d 1428, 1446–47 (10th Cir. 1987). "A defendant who acts in furtherance of the object of the conspiracy may be presumed to be a knowing participant." *United States v. Tranakos*, 911 F.2d 1422, 1430 (10th Cir.1990) (citations omitted).

▪ Although minimal, the government did present evidence from which the jury could reasonably infer both willful participation with intent to conceal and knowledge of the nature of the proceeds by Dimeck. The jury viewed a video tape of the delivery to Moore's hotel room and apparently concluded that the person making the delivery was the defendant, Kevin Dimeck, despite Dimeck's weak attempt to controvert the video tape through only argument of counsel [9] claiming that the person in the tape was some other Michigan Satellite Systems employee.

In addition, the evidence was that Pruneda told Moore that "Kevin" would deliver the money. The jury heard an audio tape of a phone conversation between Moore and a person alleged to be Dimeck. In that call, Moore was asked, "Are these Arnie's friends?" When Moore asked who the caller was, the caller responded, "Friend of [Arnie's]." The caller then said, "I'll be there in I hope less than an hour." When Moore asked what the caller looked like, the caller responded, "You'll see when I knock on the door."

The government also offered phone records which connected Pruneda to Dimeck. Dimeck said during the delivery "Throw it in

the suitcase and leave and I'll just talk to him [Arnie] later then." In addition, Pruneda made comments from which the jury could reasonably infer that the person who delivered the box had spoken directly with Pruneda *after* the delivery and had commented on Moore's physical condition during the delivery. There was also evidence that Dimeck was in touch with Pruneda after the faked seizure of the money and was concerned about any markings that may have been on the box that would tie the money back to him through his place of business. It was, therefore, reasonable for the jury to infer that Dimeck willfully participated in the conspiracy.

During the delivery, the person alleged to be Dimeck told Moore to put the money in his suitcase and, when Moore said he did not have room in his suitcase, the person told him to tape the box up so it would not be open. These statements, along with the suspicious nature of the delivery itself (delivering $60,000 in cash in a cardboard box to a hotel room), support the jury's reasonable inference that Dimeck intended to conceal the source, nature or ownership of the proceeds and that he knew they were proceeds.

▪ Both defendants also claim that merely transporting cash is not a "transaction" prohibited by the money laundering statute. We disagree. We reiterate that transporting cash meets the section 1956(c)(3) definition of "transaction" as set forth above. In addition, in *United States v. Gallo*, 927 F.2d 815, 822 (5th Cir.1991), the court assumed without deciding that transporting cash in a box is a financial transaction under section 1956(c)(4).

▪ The defendants rely on *United States v. Gonzalez–Rodriguez*, 966 F.2d 918, 926 (5th Cir.1992), a more recent Fifth Circuit case holding that transporting $8,000 in cash in a public airport does not violate section 1956(a)(1)(B)(i). We do not find the holding in *Gonzalez–Rodriguez* inconsistent with our conclusion here because the holding there was based on a lack of evidence of an intent to conceal. *See Gonzalez–Rodriguez*,

---

**9.** Dimeck did not present any evidence at trial.

966 F.2d at 926. The defendant in *Gonzalez–Rodriguez* readily admitted to authorities at the airport that she was carrying $8,000 in cash and turned the money over to them for inspection. *Id.* at 920, 926. The court distinguished *Gallo* because there was evidence of intent to conceal in *Gallo*—in addition to transporting $300,000 in cash in a box, the *Gallo* defendant made false exculpatory statements to police when he was arrested. *Id.*

Similarly, in the present case, the government offered evidence beyond the mere transportation of $60,000 in cash. As discussed above, the jury heard evidence of statements by both Salcido and Dimeck revealing an intent to conceal.

Dimeck claims that there was no concealment because he used a van with "Michigan Satellite Systems" on the side and because he did not use a disguise or a code name. We disagree. Dimeck's actions in telling Moore to tape up the box and inquiring of Pruneda about any markings on the box that would tie the money to him after it was seized by police were sufficient to support an inference of intent to conceal notwithstanding the use of the Michigan Satellite van.

Dimeck also claims that he may not be charged with the substantive offenses committed by co-conspirators that were not reasonably foreseeable. *See Pinkerton v. United States,* 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946). The instant case, however, presents a different inquiry—whether acts committed by co-conspirators may be considered against him as part of the conspiracy itself. Dimeck was charged here with only the conspiracy and not any underlying substantive crimes. All co-conspirators are responsible for the acts of other co-conspirators in furtherance of the conspiracy at least until withdrawal from the conspiracy. *United States v. Brewer,* 983 F.2d 181, 185 (10th Cir.1993); *see also Pinkerton,* 328 U.S. at 647, 66 S.Ct. at 1184 (citations omitted) ("[T]he overt act of one partner in crime is attributable to all.").

A conspirator must take affirmative action "either by making a clean breast to the authorities or communicating his withdrawal in a manner reasonably calculated to reach co-conspirators" in order to withdraw from the conspiracy. *United States v. Parnell,* 581 F.2d 1374, 1384 (10th Cir.1978), *cert. denied,* 439 U.S. 1076, 99 S.Ct. 852, 59 L.Ed.2d 44 (1979) (citations omitted). The defendant has the burden of establishing withdrawal. *Id.* Dimeck presented no evidence of withdrawal—mere cessation of activity is not enough to establish withdrawal. *See id.* Thus, it was proper to allow the jury to consider acts occurring after the January 10, 1992, delivery as part of the ongoing conspiracy.[10]

### Dimeck's Evidentiary Objections

Dimeck complains of numerous evidentiary trial errors by the court. He claims error in admitting the green bag containing marijuana residue, the rolodex card, and the telephone toll records. We find no error in our rulings on these matters.

The bag was relevant to the government's burden of proving that the money delivered by Dimeck was proceeds of specified unlawful activity, i.e. marijuana distribution. This probative value was not substantially outweighed by the danger of unfair prejudice to Dimeck.[11] The rolodex card in question was seized at Michigan Satellite Systems and contained the name "Hilde Madrigal" and a phone number. The government offered phone records at trial to show that someone at this number called a phone located at Michigan Satellite Systems business address, but listed to Kevin Dimeck personally, at least four times in the days leading up to the January 10, 1992, delivery. The rolodex card and phone records were, therefore, highly probative of Dimeck's involvement in the conspiracy and were not unfairly prejudicial.

---

10. We note that even under *Pinkerton,* it was foreseeable that the money could be confiscated during a routine traffic stop and that Pruneda would advise Moore about how to get it back.

11. This is especially true in light of the government's lack of emphasis on the significance of the bag at trial.

Defendant also complains that the government violated the spirit of Federal Rule of Criminal Procedure 16 by not disclosing the phone records earlier. In light of the government's ongoing investigation of Hilde Madrigal and the defendant's failure to establish prejudice resulting from the timing of disclosure by the government, we see no error requiring a judgment of acquittal.

IT IS THEREFORE ORDERED that defendant Kevin Dimeck's motion for judgment of acquittal (Doc. # 151) is denied.

IT IS FURTHER ORDERED that defendant Benjamin Salcido's motion for judgment of acquittal (Doc. # 150) is denied as to Counts 1 and 2.