UNITED STATES of America, Plaintiff,

v.

Huey P. GREY and Ann
P. Grey, Defendants.

No. 93–10027–01, 02.

United States District Court,
D. Kansas.

June 20, 1994.

Randall K. Rathbun, Asst. U.S. Atty., Wichita, KS, for plaintiff.

Roger L. Falk, Wichita, KS, for defendant Huey P. Grey.

Val Wachtel, Wichita, KS, for defendant Ann P. Grey.

BELOT, District Judge.

This case comes before the court on the defendants' motion for judgment of acquittal, pursuant to Fed.R.Crim.P. 29(c), or in the alternative, for a new trial, pursuant to Fed. R̀.Crim.P. 33. (Doc. 100)

Defendants were found guilty of conducting an illegal gambling business in violation of 18 U.S.C. § 1955 and fraudulently making a false oath in a bankruptcy filing, in violation of 18 U.S.C. § 152. In addition, defendant Huey Grey was found guilty of money laundering, in violation of 18 U.S.C. § 1956(a)(1)(A)(i), and fraudulently making a false oath in a bankruptcy filing, in violation of 18 U.S.C. § 152.[1]

The evidence at trial established that the defendants placed video poker machines in seven clubs throughout Kansas. These machines were used for gambling purposes by the patrons of those clubs. Defendants visited the various clubs approximately once a month, where they inspected and serviced the machines, and equally divided the proceeds of the machines with the club manager, owner, or financial officer. During the period of 1990–1992, the defendants received in excess of $300,000 from the seven clubs.

The evidence at trial established that defendant Huey Grey handed $200 to Gilbert Toman, the club manager of the Halstead American Legion Post. Toman testified that this money was used to pay out winnings to customers using the video poker machines in his club.

Finally, the evidence showed that Huey Grey filed a Chapter 12 bankruptcy proceeding in February, 1992. In connection with that bankruptcy filing, Huey Grey filed a "Statement of Financial Affairs" and "Schedules" indicating that neither he nor his spouse had any income for the calendar years 1991 and 1992. In December of 1992, both defendants filed a Chapter 13 bankruptcy proceeding, and in the "Statement of Financial Affairs" accompanying their bankruptcy filing they indicated they had an income of $18,000 in both 1991 and 1992.

The standards for considering motions for judgment of acquittal pursuant to Fed. R.Crim.P. 29 were summarized in *United States v. Dimeck,* 815 F.Supp. 1425 (D.Kan. 1993):

> In considering motions for judgment of acquittal, we must "view the evidence in the light most favorable to the government and then determine whether there is sufficient evidence from which a jury might properly find the accused guilty beyond a reasonable doubt." In rendering its verdict, the jury was entitled to consider both direct and circumstantial evidence, as well as all reasonable inferences that could be drawn therefrom. In considering a motion for judgment of acquittal, we are prohibited from weighing conflicting evidence or considering the credibility of any witnesses. We may grant the defendants' motions for judgment of acquittal only if "the evidence is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt."

*Id.* at 1427 (Citations omitted).

Defendants argue that the government failed to prove that an "illegal gambling business" was being conducted by "five or more persons." According to the defendants, each of the seven clubs constituted a separate, distinct business, whose employees cannot be aggregated for purposes of satisfying the "five or more persons" requirement of the statute.

 Defendants have provided the court with an extensive discussion of case law purporting to support their theory. Defendants correctly observe that wagerers, aiders and abettors, and persons who perform functions which are merely helpful, as opposed to necessary, to the gambling business, are excluded from the "five or more persons" requirement. None of the cases relied on by the defendants, however, supports the proposition that persons who participate in the operation of an illegal gambling business are excluded from the "five or more persons" requirement because they happen to be em-

---

1. The government dismissed Count IV of the indictment at the close of the case.

ployed by another entity under whose auspices the gambling is conducted.

Defendants' argument ignores the nature and reality of their business. It is pure sophistry to suggest that the defendants were not operating a gambling business. They supplied the machines, serviced them, and made regular visits to the clubs to collect their share of the proceeds. In essence, they were conducting a gambling business in several different locations. Since the defendants could not be at each location while the machines were in use, the assistance of persons at the clubs was necessary to the operation of the defendants' gambling business. The government produced evidence that various persons, including bartenders, managers, and other club employees made payouts, verified winnings, and reset the machines, all activities essential to the success of the gambling business.

■ In order to be counted among the five persons, the government must prove that a person conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business. 18 U.S.C. § 1955(b)(1)(ii). The word "conduct" includes all who participate in the operation of the gambling business, regardless of how minor their jobs and whether or not they be labeled as agents, runners, or independent contractors. *United States v. Boss,* 671 F.2d 396, 399 (10th Cir.1982) (Citation omitted). This indicates that the court is to focus on what the participants actually do, not their formal employment status. Under this standard, the bartenders and managers of the various clubs who made the payouts and reset the machines are properly counted towards the "five or more persons" requirement of the statute.[2]

Defendants place reliance on *United States v. Murray,* 928 F.2d 1242 (1st Cir.1991). In *Murray,* the court reversed the defendant's conviction for conducting and conspiring to conduct an illegal gambling business. The court found the evidence showed that, at most, four persons operated a gambling business out of the corner barstool of a bar for a period in excess of thirty days. *Id.* at 1246.

*Murray* provides no support for defendants' position. *Murray* does not redefine who is considered a participant in a gambling business. Rather, the *Murray* court's holding rested on its conclusion that there was insufficient evidence that certain bartenders and waitresses were participants for a period in excess of thirty days. *Id.* at 1249.[3] In the case at bar, there is abundant evidence that managers and bartenders engaged in activities that were necessary to the operation of the defendants' gambling business and therefore fall within the purview of § 1955.

■ Defendant Huey Grey attacks the money laundering conviction on the basis that the government failed to show that the $200 he provided Gilbert Toman involved the proceeds of a "specified unlawful activity." According to Grey, the $200 was to be used in promoting the same illegal gambling business from which it was derived. Thus, Grey reasons that no "transaction" as defined by 18 U.S.C. § 1956(c)(3) occurred because the $200 never left the business.

18 U.S.C. § 1956(a)(1)(A) provides, in relevant part:

> (a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—
>
> (A)(i) with the intent to promote the carrying on of specified unlawful activity;
>
> shall be sentenced ...

18 U.S.C. § 1956(c)(7) defines "specified unlawful activity" to include "any act or ac-

---

2. Defendants contend the government must show some interdependence between the businesses before they can be lumped together for purposes of the "five or more persons" requirement. (Doc. 101, pp. 43–45) Defendants overlook the nature of the interdependence. The clubs were not interdependent among each other, but were each interdependent with the defendants' business. The seven clubs were the conduit through which the defendants conducted their illegal gambling business.

3. For example, the court noted "there was no evidence presented at trial that indicates that Bergami's and Sheehan's activities as bartenders, or, in the case of Bergami, as waitress, were necessary or useful specifically to the gambling operation." *Id.*

tivity constituting an offense listed in section 1961(1)," which in turn includes· violations of § 1955.

■ The court is unpersuaded by Grey's argument. The plain text of the statute imposes no requirement on the government to prove that the proceeds of the underlying unlawful activity must be used to carry on a specified unlawful activity different from the underlying unlawful activity. Had Congress meant to impose such a requirement, it could have done so. This court declines Grey's invitation to rewrite the statute.

The court cannot agree that no transaction occurred. The term "transaction" includes the "transfer, delivery or other disposition" of the proceeds of some form of unlawful activity. 18 U.S.C. § 1956(c)(3). Huey Grey's transfer of $200 to Gilbert Toman falls within this definition. Grey's contention that Toman cannot transact with Grey because he is counted towards the "five or more persons" requirement of § 1955 is without merit. A person can participate in an illegal gambling business and yet not be employed by the gambling business. Toman not only "conducted" the illegal gambling business, but also managed the Halstead American Legion Post. The court notes that the seven clubs received fifty percent of the gambling proceeds. The government's theory is not inconsistent.

■ Grey also contends that the government failed to prove the financial transaction between Huey Grey and Gilbert Toman had the required nexus to interstate or foreign commerce. When it enacted § 1956, Congress intended to fully exercise its power under the Commerce Clause. S.Rep. No. 433, 99th Cong.2d Sess. 13 (1986). The government need only show a *de minimis* effect on interstate commerce. *United States v. Peay*, 972 F.2d 71, 74 (4th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1027, 122 L.Ed.2d 172 (1993).

In *United States v. Zeigler*, 19 F.3d 486 (10th Cir.1994), the Tenth Circuit addressed the effect-on-commerce requirement in a Hobbs Act[4] prosecution. In *Zeigler*, the defendant was convicted of robbing six separate

businesses in Tulsa, Oklahoma. On appeal, the defendant contended the government failed to prove the robberies had any effect on interstate commerce. ·

The court reiterated its view that the jurisdictional predicate of the Hobbs Act is met by a showing of "any *de minimis* effect on commerce." ˙*Id.* at 489. The court even noted that jurisdiction was properly exercised under the Hobbs Act where the underlying criminal activity presented only a potential effect on interstate commerce. *Id.* at 490. Applying these principles to the case before it, the court held that the evidence was sufficient to show that all six businesses were engaged in interstate commerce. *Id.* at 491. It found that each of the six businesses' assets were depleted in the robberies, and that the money taken by the defendant was destined to be used, at least in part, to purchase other interstate goods. *Id.* at 491–92.

■ In this case, the government argues that the $200 was derived from the video poker machines, which were made in Colorado. The government also argues that it was likely that the $200 provided to Toman by Huey Grey would go back into the machines, generate additional revenue for the defendants, who would use it to purchase more machines.

Viewing the evidence in the light most favorable to the government, the court finds that the evidence was sufficient for the jury to conclude that the $200 affected interstate commerce. While the source of the $200 is insufficient· to establish the nexus, it is reasonable to assume that the $200 would be used in the illegal gambling business. Toman confirmed this in his testimony. The gambling business generated revenues, which were in turn used to purchased not only machines but vehicles needed to drive to the various locations, service the machines and collect the proceeds. These activities have a potential effect on interstate commerce.

■ Defendants argue that their failure to disclose gaming income during the years

4. 18 U.S.C. § 1951.

1990–92 was not a material misstatement of fact in the context of a Chapter 12 or 13 bankruptcy proceeding. They contend that since debts are to be paid from future income under both Chapter 12 and 13, statements about their past income are not material. Additionally, they argue that the evidence was insufficient to show that they acted with fraudulent intent when they signed and filed the various bankruptcy documents underlying the charges against them.

■ Defendants' argument concerning the materiality of their failure to disclose gaming income borders on frivolousness. As the government points out, a debtor must propose a repayment plan under Chapter 12 and 13 in good faith. *In re Gier,* 986 F.2d 1326, 1328 (10th Cir.1993). Failing to disclose hundreds of thousands of dollars of income misleads creditors about the debtor's financial background. It could alter a creditor's decision whether to vote to confirm the plan. Truthful disclosure of the defendants' income would certainly have made the bankruptcy court skeptical of the defendants' integrity and motivations.

Defendants also argue that the evidence on their intent was circumstantial in nature and as a result, insufficient to support the jury's finding of guilt. The defendants cannot really expect the court to take this argument seriously. As the golfer Lee Trevino once remarked, "I was born at night, but not last night." If the defendants' argument is to be believed, the government could rarely convict anyone. Since a defendant has the constitutional right not to testify, how could there ever be direct proof of a defendant's intent? This could only happen if the defendant testified and admitted the crime or specifically told a government witness of his or her intent.

■ Contrary to defendants' apparent belief, circumstantial evidence may be used to explain a defendant's intent. In this case, the evidence strongly indicates the defendants acted fraudulently. The sheer magnitude of the amounts of income not disclosed negates *any* suggestion that defendants were mistaken or overlooked an error. It must be remembered that defendant Huey Grey reported that he and his wife had *zero* income

on one of the forms. Even the most careless debtor would be expected to find that statement difficult to swallow, in light of the defendants' activities.

The defendants' motion for judgment of acquittal is denied.

### Motion for a New Trial

Defendants alternatively seeks a new trial. The court may grant a motion for new trial "if required in the interest of justice." Fed. R.Crim.P. 33. "A motion for new trial 'is not regarded with favor and is granted only with great caution, being addressed to the sound discretion of the trial court.'" *United States v. Page,* 828 F.2d 1476, 1478 (10th Cir.), *cert. denied,* 484 U.S. 989, 108 S.Ct. 510, 98 L.Ed.2d 508 (1987) (quoting *United States v. Allen,* 554 F.2d 398, 403 (10th Cir.), *cert. denied,* 434 U.S. 836, 98 S.Ct. 124, 54 L.Ed.2d 97 (1977)).

Defendants argue the court erred in failing to give their requested jury instructions. Defendants do not specifically complain about any instruction given by the court, but simply maintain that their requested instructions would have been a more accurate and correct statement of the law.

■ Jury instructions must "'fairly, adequately, and correctly state the governing law and provide the jury with an ample understanding of the applicable principles of law and factual issues confronting them.'" *Watson v. Blankinship,* 20 F.3d 383, 392 (10th Cir.1994) (quoting *United States v. Denny,* 939 F.2d 1449, 1454 (10th Cir.1991)). The court considers the jury instructions as a whole to determine whether the jury was provided with an accurate statement of the applicable law. *United States v. Martin,* 15 F.3d 943, 952 (10th Cir.1994) (Citations omitted).

The court finds that its instructions correctly and adequately stated the applicable law. Defendants fail to point out any material omission or misstatement of the law in the instructions. Most of the defendants' requested instructions were covered by the instructions actually given by the court, and the remaining requested instructions were

either unnecessary (i.e. purpose of a Chapter 13 bankruptcy) or unsupported by the evidence (i.e. whether Ann Grey read certain documents she signed).

■ Defendants argue the court erred when it allowed Donald Lutrell, an employee of the Nebraska State patrol, to testify as an expert witness on the operation of video poker machines and their use as gambling devices. Defendants maintain that Lutrell was not qualified as an expert on the subject of gambling devices.

Under Fed.R.Evid. 702, an expert's opinion must have "a reliable basis in the knowledge and experience of his discipline." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. ——, ——, 113 S.Ct. 2786, 2796, 125 L.Ed.2d 469, 482 (1993). In this case, Lutrell testified that he had attended a ten day training course in Las Vegas, Nevada, on the subject of gambling devices. During that course, he worked with video poker machines. Lutrell had also accompanied other agents on several raids during which gambling devices were confiscated. Based on this foundation, the court permitted Lutrell to offer his opinion that the video poker machine belonging to the defendants was used for gambling purposes.

Lutrell was more than qualified to testify as an expert. The opinions he offered were well within the scope of his expertise. By virtue of his training as well as his practical experience in analyzing video poker machines, he could reasonably conclude that the video poker machine in question was used for gambling. The court found Lutrell to be a very credible witness.

Moreover, the court agrees with the government that the defendants' argument is anomalous. Defendants first contend that Lutrell's testimony was unnecessary because there was no dispute that the video poker machine taken from the Elks Lodge in Newton was a gambling device. In the next breath, defendants complain that Lutrell offered testimony that went to the ultimate issue in the case and should have been excluded under Fed.R.Evid. 704(b).

■ In light of defendants' admission that no dispute existed over whether the video poker machine was used for gambling purposes, the court cannot envision how defendants were harmed by Lutrell's testimony. Defendant Huey Grey's counsel even conceded in closing argument that gambling was taking place in the seven clubs. Lutrell's testimony did not prejudice the defendants.

Defendants' motion for a new trial is denied.

IT IS SO ORDERED.