**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Huey P. GREY and Ann P. Grey,**
**Defendants–Appellants.**

Nos. 94–3217, 94–3218.

United States Court of Appeals,
Tenth Circuit.

May 22, 1995.

Daniel E. Monnat of Monnat & Spurrier, Chartered, Wichita, KS, for defendant-appellant Huey P. Grey.

Laura B. Shaneyfelt of Focht, Hughey & Calvert, Wichita, KS, for defendant-appellant Ann P. Grey.

Randall K. Rathbun, U.S. Atty. (Stephen K. Lester, Asst. U.S. Atty., with him on the brief), Wichita, KS, for plaintiff-appellee.

Before ANDERSON, ALDISERT *, and HOLLOWAY, Circuit Judges.

---

* Ruggero J. Aldisert, Senior Judge for the United States Court of Appeals for the Third Circuit, sitting by designation.   ·

ALDISERT, Circuit Judge.

In these consolidated appeals of Huey P. Grey, No. 94–3217, and his wife Ann P. Grey, No. 94–3218, we must first consider their combined contentions stemming from their convictions and sentences following a jury trial, in which the Greys were charged with conducting an illegal gambling business involving the operation of video poker machines in violation of 18 U.S.C. § 1955 (Count I), and with making false oaths and accounts by understating their income in a Chapter 13 bankruptcy filing in violation of 18 U.S.C. § 152 (Count V). Mr. Grey appeals also his conviction and sentence in connection with a fraudulent Chapter 12 filing in violation of 18 U.S.C. § 152 (Count III), and money laundering in violation of 18 U.S.C. § 1956(a)(1)(A)(i) (Count II).

Jurisdiction was proper in the trial court based on 18 U.S.C. § 3231. This court has jurisdiction under 28 U.S.C. § 1291. The appeals were timely filed under Rule 4(b), Federal Rules of Appellate Procedure.

The Greys argue that there was insufficient evidence to convict them of conducting an illegal gambling operation because the "five-person" statutory requirement was not satisfied, that the district court erred in providing and omitting various jury instructions, and that the information and indictment as to the bankruptcy fraud counts was fatally defective in that they failed to state the materiality element of the cause of action. Mrs. Grey further contends that the district court erred in refusing to grant a two point reduction in offense level under the Sentencing Guidelines for her minor role in the offenses. Mr. Grey also challenges the computation of his offense level under the Guidelines with respect to the gambling and bankruptcy counts and challenges his conviction under the money laundering statute.

We affirm the conviction and sentence of Ann Grey and affirm the conviction of Huey Grey with respect to the illegal gambling operation and bankruptcy fraud counts. We vacate Mr. Grey's sentence for money laundering and reverse the conviction, and we

remand for resentencing on the gambling and bankruptcy counts.

## I.

From 1990 until November 1992, Mr. and Mrs. Grey ran a gambling business involving the operation of at least 20 video poker machines located at seven establishments in six different towns in Kansas. During this period, the Greys entered into business arrangements with the establishments under which they would place and service the poker machines. Unlike video poker devices found in legal casinos, these machines did not make immediate payoffs; they merely recorded credits. When a player wished to cash in accumulated credits, he or she would notify a bartender or other designated club officer. That individual would either make a cash payout at that time or record the credits earned for future payment. This practice constituted illegal gambling under state law. The Greys and the establishments divided the net proceeds on a 50–50 basis. During this period, the Greys' share was approximately $376,718.08. The enterprise came to end on November 5, 1992, when the establishments were raided and the machines seized.

In considering the Greys' post-trial motions, the district court concluded that they conducted a single illegal gambling business in several different locations involving "five or more persons." *United States v. Grey,* 856 F.Supp. 1515, 1518 (D.Kan.1994). "The clubs were not interdependent among each other, but were each interdependent with the defendants' business." *Id.* at 1518 n. 2. Ann Grey was sentenced to one year and a day imprisonment and fined $2,000. Huey Grey was fined $12,500 and sentenced to 70 months imprisonment on the money laundering count and 60 months on the gambling and bankruptcy counts of conviction, with all sentences to run concurrently.

## II.

Both Huey and Ann Grey were convicted of operating an illegal gambling business in violation of 18 U.S.C. § 1955 (Count I), which defines an "illegal gambling business" as a gambling business which—

(i) is a violation of the law of a State or political subdivision in which it is conducted;

(ii) involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and

(iii) has been or remains in substantially continuous operation for a period in excess of thirty days....

18 U.S.C. § 1955(b)(1). The Greys challenge their convictions under subparts (ii) and (iii) of the statute, arguing that there was insufficient evidence to support their convictions.

"We must affirm the judgment of conviction if there is record evidence which would allow a rational trier-of-fact to find the appellants guilty of the crimes charged in the indictment." *U.S. v. Pinelli,* 890 F.2d 1461, 1465 (10th Cir.1989) (citing omitted), *cert. denied,* 494 U.S. 1038, 110 S.Ct. 1498, 108 L.Ed.2d 632 and 495 U.S. 960, 110 S.Ct. 2568, 109 L.Ed.2d 750 (1990). We must view the evidence "in the light most favorable to the government." *Id.*

■ The district court concluded that the Greys were conducting a single gambling business in several different locations and that, although each club may have been independent of the other clubs, each was interdependent with the Greys' business. Moreover, the court determined that the bartenders and managers who recorded winnings, made payouts and reset the machines were properly counted towards the "five or more persons" statutory requirement. We agree.

Although the Greys argue that there were seven distinct gambling operations, each comprised of less than five persons, we are persuaded that the Greys were the "hub" in one grand illegal gambling operation involving seven different "spokes" or, alternatively, that most of the seven independent operations involved five or more persons.

The Greys' video poker machine enterprise consisted of more than 20 machines located at seven clubs. Huey Grey financed, managed, supervised, directed and owned all or part of the business, and cleaned and maintained the machines at the establishments. Mrs. Grey visited the clubs regularly, record-

ed payouts, calculated profits and divided the earnings with each club. The Greys shared in the illegal profits from all seven establishments. This clearly was one business with respect to Huey and Ann Grey. In addition to the Greys, each of the seven establishments had at least one person in charge of resetting the machines, keeping track of money and making payouts. At a minimum, then, there were nine persons involved in the operation, well in excess of the statutory minimum.

Even if we were to view this gambling business as seven distinct operations, we are satisfied that the participation by other employees in the various clubs who recorded credits, made payouts and reset the machines in the absence of the designated managers was "necessary" to the operation, allowing these employees to count toward the "five person" requirement. *Pinelli,* 890 F.2d at 1478; *United States v. Boss,* 671 F.2d 396, 400 (10th Cir.1982).

We conclude also that this illegal gambling operation continued for a period in excess of thirty days. *See United States v. Smaldone,* 485 F.2d 1333, 1351 (10th Cir.1973).

### III.

■ The Grey's next contend that the court erred in not giving their requested instructions. We review the record as a whole to determine whether the actual instructions adequately stated the governing law and provided the jury with an accurate understanding of the issues and standards applicable. *United States v. Sasser,* 971 F.2d 470 (10th Cir.1992). "While a defendant is entitled to an instruction regarding his theory of the case, the district judge has substantial discretion in formulating the instructions, so long as they are correct statements of the law and adequately cover the issue presented." *United States v. Vasquez,* 985 F.2d 491, 496 (10th Cir.1993).

■ The Greys argue that the court erred in not giving their proposed jury instruction regarding the definition of "substantially continuous operation," which they argue was a concise and accurate statement in conformity with the laws of this court. They suggest

their proposed instruction "would have provided the jury with a much clearer understanding of the interplay of the elements of Section 1955." However, the Greys are unable to identify how the instruction given was erroneous or inadequate. Consequently, they have failed to demonstrate an abuse of discretion.

The Greys contend also that the district court erred in refusing to provide an instruction concerning interdependency of the establishments. As discussed above, the court rejected the Greys' argument that because each establishment was not dependent on the other, there were seven distinct gambling businesses rather than one for the purposes of calculating participants. The refusal of the district court to accept the Greys' arguments and accordingly instruct the jury was not error.

■ The Greys next argument is that the court erred in refusing to instruct the jury that the government must prove that at all times during some thirty-day period at least five persons conducted an illegal gambling business. The "five or more persons" requirement is separate from the thirty day requirement and, consequently, the government did not have to show that five or more persons at all times continued the operation for a period in excess of thirty days. *Smaldone,* 485 F.2d at 1351.

They suggest also that the district court incorrectly instructed the jury on fraudulent intent. The court's instructions covered the elements of the offense and defined the terms "knowingly," "willfully," "false oath or account" and "fraudulent." After carefully considering the court's instructions, we conclude that the district court exercised proper discretion.

### IV.

■ We also reject the Greys' argument that the information and indictment as to the bankruptcy fraud counts III and V were defective because they failed to state that the Greys' knowing and fraudulent statements, made in violation of 18 U.S.C. § 152, were material. We review the language of an indictment to determine whether it fully and

accurately includes all essential elements of the offense. "[T]he legal sufficiency of an indictment may be challenged at any time, but where the objection is not raised before or during trial the challenged language will 'be construed liberally in favor of validity.'" *United States v. Sullivan*, 919 F.2d 1403, 1410 n. 5 (10th Cir.1990) (quoting *United States v. Freeman*, 813 F.2d 303, 304 (10th Cir.1987)). "An indictment that sets forth the words of the statute generally is sufficient so long as the statute itself adequately states the elements of the offense." *United States v. Darrell*, 828 F.2d 644, 647 (10th Cir.1987) (citations omitted).

■ The Greys assert for the first time that, although materiality is not an included element under the statute, case law has engrafted such a requirement. Examining this contention under the plain error standard, we are satisfied that the fact that debtors in Chapters 12 and 13 bankruptcies substantially understate their income both for the current year and the past year on the Statement of Financial Affairs, as the indictment alleges, is a sufficient factual allegation of materiality.

The Greys further quarrel with the court for limiting the closing statements of their counsel in which they maintained that the Greys had no intent to defraud because the creditors in the bankruptcy would be paid from future income and that Huey Grey's actions were the result of his fear of losing the family farm. We are persuaded that there was no abuse of discretion. *See Cole v. Tansy*, 926 F.2d 955, 958 (10th Cir.1991).

We have also reviewed the Greys' various contentions that the court erred in imposing sentences under Sentencing Guidelines for the gambling and bankruptcy convictions. Utilizing the appropriate standards of re-

view, we will not disturb the sentences imposed by the district court.[1]

We have carefully considered all the arguments advanced by the parties on the gambling and bankruptcy counts and conclude that no further discussion is necessary.

## V.

We now turn to the most troublesome of the numerous issues presented in these appeals, Huey Grey's conviction and sentence of 70 months imprisonment for money laundering.

Mr. Grey's conviction under 18 U.S.C. § 1956 stems from a single incident at one of the seven clubs, the American Legion Post at Halstead, Kansas. Finance officer and club manager Gilbert Toman agreed to place one video poker machine in his club but was hesitant to make payouts. Reluctantly, he commenced paying winners on June 23, 1992 until he complained to Huey Grey that the pot was too low. On July 25, Mr. Grey gave Mr. Toman $200 in cash to feed the pot, and the gambling operation resumed until the club was raided on November 5, 1992. During that time, Toman made the payouts and, in his absence, a bartender verified points scored and reset the machines.

Section 1956 defines "financial transaction" for the purpose of money laundering as:

(A) a transaction which in any way or degree affects interstate or foreign commerce (i) involving the movement of funds by wire or other means or (ii) involving one or more monetary instruments, or (iii) involving the transfer of title to any real property, vehicle, vessel, or aircraft, or (B) a transaction involving the use of a financial institution which is engaged in, or the

---

1. Ann Grey argues that she was entitled to a two-point reduction because she was a "minor participant." Huey Grey contends that he was entitled to a two-point reduction for acceptance of responsibility, and that he was undeserving of a two-point increase for his role as an organizer and leader. Whether a defendant is a minor participant is a finding of fact we must accept unless clearly erroneous. *United States v. Calderon–Porras*, 911 F.2d 421, 422 (10th Cir.1990).

Similarly, we review the sentencing court's determination that Mr. Grey was an organizer for clear error. *United States v. Levine*, 970 F.2d 681, 691 (10th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 289, 121 L.Ed.2d 214 (1992). Finally, we review the district court's refusal to grant a reduction in offense level for acceptance of responsibility for clear error. *United States v. Lindholm*, 24 F.3d 1078 (10th Cir.1994).

activities of which affect, interstate or foreign commerce in any way or degree.

18 U.S.C. § 1956(c)(4).

Mr. Grey now argues, among other things, that there was insufficient evidence to establish that the $200 he gave to Mr. Toman in order to help feed a depleted "pot" affected interstate commerce in violation of the money laundering statute, 18 U.S.C. § 1956. In challenges such as this, based on the sufficiency of the evidence, we must affirm only if there is record evidence which would allow a rational trier-of-fact to find Mr. Grey guilty of money laundering. *United States v. Pinelli,* 890 F.2d at 1465.

■ A "minimal effect" on interstate commerce is all that is required to establish federal jurisdiction. *See United States v. Kelley,* 929 F.2d 582, 586 (10th Cir.1991), *cert. denied,* 502 U.S. 926, 112 S.Ct. 341, 116 L.Ed.2d 280 (1992).

The government responds:

The very fact that Mr. Grey transferred cash money, i.e., Federal Reserve Notes, to Mr. Toman affected interstate commerce. Congress has the power to borrow and coin money. Federal Reserve Notes are printed by the Treasury Department and issued and eventually redeemed, through the twelve Federal Reserve Banks, the closest being located in Kansas City, Missouri. (*See,* 12 U.S.C. §§ 222, 411, *et seq.).* The money handed over to Mr. Toman had already moved in interstate commerce.

Brief for Appellee at 26.

The district court rejected this contention, stating that the "source of the $200 is insufficient to establish the nexus." *United States v. Grey,* 856 F.Supp. 1515, 1519 (D.Kan.1994). However, the court then erred in finding an effect on interstate commerce based on its belief that proceeds from gambling "purchased not only machines but vehicles needed to drive to the various locations, service the machines and collect the proceeds. These activities have a potential effect on interstate commerce." *Id.*

The district court's reasoning flies in the face of our teachings in *United States v. Levine,* 41 F.3d 607 (10th Cir.1994), where we held that language identical to Section 1956(c)'s "affects interstate or foreign commerce", contained in 18 U.S.C. § 1365(b), is "phrased in the present tense" and accordingly:

"Affects" suggests that the [activity] must have either a present effect or an effect in the future, and appears to exclude [pre-activity] events....

[W]e hold that the effect on interstate commerce must occur at or after [the activity]....

41 F.3d at 614.

On the authority of *Levine,* we reject the government's suggestion, urged at oral argument, that the interstate commerce nexus was met by proof that the single video poker machine installed at the Halstead American Legion had been manufactured in Colorado and had crossed the state line into Kansas. There was no proof that any of this activity took place after Huey Grey gave Mr. Toman the money at Halstead.

■ We are left only with the contention that the nexus is somehow met by concluding, without any proof in the record, that the particular $200 handed to Mr. Toman had travelled in interstate commerce. However, the government can garner no support from the money laundering cases they cite because, in each of those cases, the prosecution successfully, in the Watergate idiom, "followed the money" both before and after the incident and introduced appropriate evidence demonstrating how the money affected interstate commerce. *See United States v. Kelley,* 929 F.2d 582, 586 (10th Cir.1991) (money laundering proceeds used to buy car made in Michigan but sold in Oklahoma affected interstate commerce), *cert. denied,* 502 U.S. 926, 112 S.Ct. 341, 116 L.Ed.2d 280 (1992); *United States v. Gallo,* 927 F.2d 815, 823 (5th Cir.1991) (evidence showed that Gallo received $300,000 in proceeds from drug sale and transported it in a shoebox by car on an interstate highway, the court emphasizing interstate highway use but "reserving judgment on a case in which the connection between the money and the drugs or illegal activity is not so clear as it is here"); *United States v. Peay,* 972 F.2d 71, 74 (4th Cir.1992)

(nexus satisfied because money derived from drug sale was deposited in FDIC insured bank, and because reports sent to FDIC deal with money deposited from many sources, including those outside the state), *cert. denied,* —— U.S. ——, 113 S.Ct. 1027, 122 L.Ed.2d 172 (1993); *United States v. Eaves,* 877 F.2d 943 (11th Cir.1989) (affect on interstate commerce shown where developers sent option payments for purchase of property from Atlanta, Georgia to a bank in Jacksonville, Florida), *cert. denied,* 493 U.S. 1077, 110 S.Ct. 1129, 107 L.Ed.2d 1035 (1990).

We find no proper analogy between these cases and the one at bar. In the language of the logicians, the positive resemblances in the facts do not outweigh the negative resemblances in the compared factual scenarios.[2] Here the government did not introduce a shred of evidence showing the origin or destination of the specific $200 in Federal Reserve Notes that constituted the single alleged money laundering transaction, no proof of the circumstances or location under which Huey Grey came into their possession or how they were eventually distributed by the two Halstead American Legion employees—Finance Officer Gilbert Toman or the bartender.

The government's burden of proving an effect on interstate commerce under the money laundering statute is not very high: Indeed, it is at the very lowest of thresholds. There is "substantial agreement that the 'in or affecting interstate commerce' requirement has been broadly read and that a 'minimal effect' on interstate commerce is sufficient to establish federal jurisdiction." *United States v. Kelley,* 929 F.2d 582, 586 (10th Cir.1991). "Minimal" is defined as "of, being, or having the character of a minimum." "Minimum" means "the least quantity assignable, admissible, or possible in a given case." Webster's Third New International Dictionary, Unabridged (1968).

"Minimal" means that the government must prove something, some effect on interstate commerce. Without delving into metaphysics, we can suggest at least that something is more than nothing. Here the government proved nothing, nothing more than that $200 in cash currency was used. The government would have us hypothesize the source and ultimate destination of the $200 in Federal Reserve Notes without one iota of evidence related to its origin or proof of what subsequently took place with the funds, as did the government prosecutors in *Kelley, Gallo, Peay,* and *Eaves.* It asks us to take a gigantic leap in federal criminal law jurisprudence without offering a single precedent in justification or, in lieu thereof, a reasoned discourse to support its position. The necessary underpinning to establish the way or degree that a transaction affects interstate or foreign commerce is always factual in nature. It must be established by direct or circumstantial evidence. "Inferred factual conclusions based on circumstantial evidence are permitted only when, and to the extent that, human experience indicates a probability that certain consequences can and do follow from the basic circumstantial facts." *Edward J. Sweeney & Sons, Inc. v. Texaco,* 637 F.2d 105, 116 (3d Cir.1980), *cert. denied,* 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981). The requisite factual underpinning was lacking here to establish even a minimal effect on interstate commerce.[3]

---

**2.** One must always appraise an analogical argument very carefully. Several criteria may be used:

- The acceptability of the analogy will vary proportionally with the number of circumstances that have been analyzed.
- The acceptability will depend upon the number of positive resemblances (similarities) and negative resemblances (dissimilarities).
- The acceptability will be influenced by the relevance of the purported analogies. An argument based on a single relevant analogy connected with a single instance will be more cogent than one which points out a dozen irrelevant resemblances.

Ruggero J. Aldisert, *Logic for Lawyers: A Guide to Clear Legal Thinking* 95–96 (1989).

**3.** Citing *NLRB v. Jones & Laughlin Steel Corp.,* 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893 (1937), the Supreme Court has recently emphasized the "indirect and remote" effects on interstate commerce:

In *Jones & Laughlin Steel,* the Court warned that the scope of the interstate commerce power "must be considered in the light of our dual system of government and may not be extended so as to embrace effects upon interstate commerce so indirect and remote that to embrace them, in view of our complex society,

In essence, the government asks this court to rewrite the money laundering statute. It asks us to vitiate the language "a transaction which in any way or degree affects interstate or foreign commerce," and substitute instead the notion that "federal jurisdiction under the money laundering statute is vested in any transaction involving Federal Reserve Notes." This we refuse to do. We lack both the inclination and the power. Moreover, we doubt that even Congress could do this without offending the constitution. We therefore hold that the government failed to prove the requisite federal jurisdiction in the prosecution of Huey Grey under 18 U.S.C. § 1956. We reverse his conviction and vacate his sentence for money laundering.

## VI.

Huey Grey was sentenced to 60 months on the bankruptcy fraud counts and 60 months on the illegal gambling count, although the record does not reflect how the sentencing court arrived at these figures. At sentencing, the court specifically stated that "the effect of the money laundering count raises the applicable guideline range here dramatically from 21 to 27 months to 70 to 87 months." Sentencing Transcript (June 30, 1994) at 21. In light of that statement, the 60 month sentences on Counts I, III and V may be improper. Consequently, we remand for sentencing with respect to these counts.

## VII.

The judgment and sentence of the district court are AFFIRMED with respect to Ann Grey in her convictions under 18 U.S.C. § 1955 and 18 U.S.C. § 152. The judgment of the district court is AFFIRMED with respect to Huey Grey in his convictions under 18 U.S.C. § 1955 and 18 U.S.C. § 152. Mr. Grey's sentence for violating 18 U.S.C. § 1956(a)(1)(A)(i) is VACATED in all respects and the conviction REVERSED, and his sentences under 18 U.S.C. § 1955 and 18

would effectually obliterate the distinction between what is national and what is local and create a completely centralized government." 301 U.S., at 37, 57 S.Ct., at 624.

U.S.C. § 152 are VACATED and the proceedings REMANDED for resentencing.

*U.S. v. Alfonso Lopez, Jr.*, —— U.S. ——, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995).