**UNITED STATES of America,**
**Plaintiff-Appellant,**

v.

**Ronald Floyd WHITE,**
**Defendant-Appellee.**

**No. 80–1760.**

United States Court of Appeals,
Tenth Circuit.

Argued and Submitted May 13, 1981.

Decided March 2, 1982.

Rehearing Denied April 1, 1982.

Kenneth P. Snoke, Asst. U. S. Atty., Tulsa, Okl. (Hubert H. Bryant, U. S. Atty., Tulsa, Okl., with him on the brief), for plaintiff-appellant.

Joel L. Wohlgemuth of Prichard, Norman & Wohlgemuth, Tulsa, Okl., for defendant-appellee.

Before BARRETT and LOGAN, Circuit Judges, and KERR, District Judge.*

LOGAN, Circuit Judge.

The United States appeals from a district court order granting Ronald Floyd White's motion for a judgment of acquittal after a jury had found him guilty of mail fraud, in violation of 18 U.S.C. § 1341, and interstate transportation of more than $5,000 that had been taken by fraud, in violation of 18 U.S.C. § 2314. The issues on appeal are whether the Double Jeopardy Clause bars the government's appeal and whether the court erred in granting White's motion for acquittal.

---

* Honorable Ewing T. Kerr, of the United States District Court for the District of Wyoming, sitting by designation.

Count one of the indictment alleges that White used the mails in implementing a scheme to obtain money fraudulently by inducing individuals to purchase partnership interests in Tanaha Gas and Oil Company (Tanaha), a partnership White organized, by falsely representing that he owned leasehold rights in three Oklahoma oil and gas leases (the Bruce, Harjoche, and Walker properties), that he had recently reworked an oil well on a nearby property, and that he would use his best efforts to rework existing oil wells and drill new wells on the tracts. Count two of the indictment alleges that on or about May 23, 1978, White transported $9,500 from Sapulpa, Oklahoma, to Texas, knowing that the money had been taken by fraud.

Several times throughout the trial White's counsel moved for a judgment of acquittal. Each time the district court stated it would reserve decision until the jury returned its verdict. After the jury returned a verdict finding White guilty of both charges, the court reconsidered and granted the motion for acquittal. The government appeals.

White contends that the Double Jeopardy Clause prohibits the government from appealing the district court's judgment of acquittal. But the Supreme Court has held that the Double Jeopardy Clause prohibits a government appeal only when there is danger of subjecting a defendant to a second trial for the same offense. *United States v. Wilson*, 420 U.S. 332, 342, 344–45, 95 S.Ct. 1013, 1021, 1022, 43 L.Ed.2d 232 (1975). When, as here, a trial judge rules in favor of a defendant after a jury has found the defendant guilty, no retrial is necessary, and double jeopardy does not attach. If the government wins on appeal, the jury verdict is simply reinstated.

The government contends that the district court erred in granting White's motion for acquittal, arguing, first, that the court applied an incorrect standard too favorable to the defendant. The government argues that the case most relied on by the trial judge, *Curley v. United States*, 160 F.2d 229 (D.C.Cir.), *cert. denied*, 331 U.S.

837, 67 S.Ct. 1511, 91 L.Ed. 1850 (1947), states a different standard than Tenth Circuit cases. We do not agree. The trial judge cited a particular passage in *Curley*:

"The true rule, therefore, is that a trial judge, in passing upon a motion for directed verdict of acquittal, must determine whether upon the evidence, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact, a reasonable mind might fairly conclude guilt beyond a reasonable doubt."

*Id.* at 232 (footnote omitted). Our Circuit has stated the rule as requiring the trial court, in considering a motion for acquittal, to view the evidence in the light most favorable to the government and then determine whether there is substantial evidence from which a jury might properly find the accused guilty beyond a reasonable doubt. *See, e.g., Maguire v. United States*, 358 F.2d 442, 444 (10th Cir.), *cert. denied*, 385 U.S. 801, 87 S.Ct. 9, 17 L.Ed.2d 48 (1966); *Cartwright v. United States*, 335 F.2d 919, 921 (10th Cir. 1964). We agree with the trial judge that there is no essential difference between the *Curley* statement and the Tenth Circuit rule. Both recognize the right of the jury to determine credibility and to find the facts; both permit the court to enter a judgment of acquittal only if the evidence that defendant committed the crime is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt. We conclude that the district court stated the correct legal standard of review.

Second, the government argues that when viewed in the light most favorable to the government, the evidence supports the jury's verdict. We agree. We are reluctant to reverse the conscientious trial judge's ruling, but we are convinced he applied the correct legal standard in an erroneous manner.

Our standard of review of the district court's grant of the defendant's motion for acquittal is the same as the trial court applied when passing on the motion. We must view the evidence, both direct and

circumstantial, in the light most favorable to the government, and without weighing conflicting evidence or considering the credibility of witnesses, determine whether that evidence, if believed, would establish each element of the crime. *United States v. Downen*, 496 F.2d 314, 318 (10th Cir.), *cert. denied*, 419 U.S. 897, 95 S.Ct. 177, 42 L.Ed.2d 142 (1974); *Goff v. United States*, 446 F.2d 623, 624 (10th Cir. 1971). If the government has met that standard, we, as well as the trial court, must defer to the jury's verdict of guilty. This standard reflects a deep respect for the fact-finding function of the jury.

■■■ Count one charges White with mail fraud. The elements of mail fraud are (1) a scheme or artifice to defraud or obtain money or property by false pretenses, representations, or promises, and (2) use of the United States mails to further the scheme. *United States v. Seasholtz*, 435 F.2d 4, 8 (10th Cir. 1970). A scheme to defraud by false representations is one "reasonably calculated to deceive persons of ordinary prudence and comprehension." *Gusow v. United States*, 347 F.2d 755, 756 (10th Cir.), *cert. denied*, 382 U.S. 906, 86 S.Ct. 243, 15 L.Ed.2d 159 (1965). Implicit in this definition is the requirement that the misrepresentations be material. Further, as *Gusow* states, deceitful *concealment* of material facts may also constitute fraud. *Id.* Whether a defendant's misrepresentations were made with the requisite intent to defraud is a question for the jury. *E.g., United States v. Themy*, 624 F.2d 963, 965 (10th Cir. 1980).

■■■ Use of the mails is not in dispute; only the first element is in question here. To determine whether the government's evidence is sufficient to establish that White was engaged in a scheme or artifice to defraud investors by use of false representations or promises, we must relate some of the facts, as a reasonable jury could have found them. White first became aware of the Bruce, Harjoche, and Walker properties in October 1977, while in Sapulpa, Oklahoma, to inspect the adjoining Richart property for Amord Corporation (Amord). Carl Langford, Amord's president, had hired White to inspect the Richart property and to meet with Thomas Bennett, who, together with Amord, held oil lease rights to that property. During his second visit to Sapulpa as an Amord employee, White observed James Bennett, Thomas's son, rework an oil well on the Richart property using a steam recovery method, which increases a well's production by loosening oil from the underground structures.[1]

In late November or early December, Langford, who also was acting president of Maligaya Corporation (Maligaya), a California investment corporation, hired White to obtain for Maligaya subleases for the oil rights on the Bruce, Harjoche, and Walker properties. On December 28, 1977, the Bennetts, who held leases for the oil rights on the properties, signed an agreement granting White and Maligaya, as sublessees, the right to rework existing wells and drill new ones on the three properties. White signed as "Attorney and Agent for Maligaya Corporation." Believing that the sublease gave White an interest in the three properties, Maligaya flew White to California to convince him to assign all his interest in the Bruce, Harjoche, and Walker properties to Maligaya.[2] At trial, although White's counsel presented a document whereby Jose Santana, an employee of Amord and possibly of Maligaya,[3] purportedly assigned Maligaya's interest in the three properties to White, Santana testified that White must have altered the instrument because the assignment was actually the reverse: On

---

1. Although White claims that he helped rework the well, government witness James Bennett testified that he did all the work and White only observed.

2. White testified that he paid for his own airline ticket to California, but according to government testimony, supported by an exhibit, the meeting was held at Maligaya's request and Maligaya paid for the ticket.

3. At trial, government witness Santana testified that Carl Langford, acting president of Maligaya, had hired him. However, Oseas Jabola, a principal investor in Maligaya, denied that Maligaya had ever employed Santana.

January 18, 1978, White assigned all interests *he* had to Maligaya.[4] The next day White entered into an employment contract with Maligaya, which provided that Maligaya would pay White $500 per month to rework the oil wells on the Bruce, Harjoche, and Walker tracts.[5]

Some time in early February, White spoke to his father, Floyd Young, about the possibility of forming a partnership to rework the oil wells on the Bruce, Harjoche, and Walker tracts. White told Young he had acquired the rights to rework the wells on these tracts, and showed Young the document purportedly assigning Maligaya's interest to White. He also told Young that he had reworked an oil well on the Richart lease using the steam recovery method, and that he would use that method to rework the wells on the other three tracts. Young became interested and contacted three other friends about forming a partnership with White. At two meetings in Houston held later that month, White, Young, and the other three discussed the oil venture. White again stated that he had acquired Maligaya's oil drilling and reworking rights to the Bruce, Harjoche, and Walker properties, had successfully reworked a well on the Richart lease using the steam recovery method, and would use this method to rework existing wells on the three properties. He also said he would drill a new well on the Bruce property using a rig he could borrow from the Bennetts. White made it clear to the group that under his sublease, he had to rework some wells and drill a new well before May 27.

On February 27 the parties entered into the Tanaha partnership. As general partner White agreed to contribute his interest in the three properties and to work the oil fields.[6] In return, as limited partners the other four individuals agreed to pay White $600 per month and contribute about $37,-000 to the partnership, the sum White had estimated he would need to develop the wells.

In March, White moved to Sapulpa, Oklahoma. Between March and mid-May White spent his time constructing from scratch a trailer apparently designed to support a steam recovery unit. White never reworked any of the wells, nor did he drill a new well. Sometime during April, Jose Santana visited White in Sapulpa and expressed an interest in joining the Tanaha partnership. On April 27 Santana agreed to pay White $6,250 down and another $6,250 upon demand, in exchange for forty percent of White's interest in the Tanaha partnership.[7]

Meanwhile, Floyd Young, who the Tanaha partners had agreed would maintain the partnership records, became concerned because White had not sent him any purchasing records or cancelled checks. He spoke to White in the middle of May and told him he was going to come to Sapulpa at the end of the month. A few days later, on May 16 and 17, White withdrew $9,500

---

4. The contract assigning White's interest to Maligaya was never produced at trial. Santana claimed that Carl Langford, who had mysteriously disappeared and could not be found at the time of trial, had possession of the contract.

   Although White disagreed with Santana's story and testified that Maligaya had assigned its interest to him, he conceded that he himself had questioned the legality of the assignment. White said he believed Santana was not an employee of Maligaya nor had authority to make the assignment, and therefore White did not bother to record the assignment.

5. The government argues that it would have been ridiculous for Maligaya to pay White to rework oil wells in which Maligaya no longer held any interest.

6. At trial White testified that the partnership was to pay him $20,000 for his interest in the sublease, and for that reason, he was justified in taking money from the partnership account for his personal use. Young and others testified that it was made clear White was to contribute his interest in the leases in exchange for his $10/32$ interest in Tanaha.

7. Santana testified that although he knew White at that time held no interest in the Bruce, Harjoche, and Walker properties, White had told him Thomas Bennett would convey to White the drilling rights to those properties after the Maligaya sublease expired on May 27. In effect, Santana testified that he invested in the Tanaha partnership on White's assurance he would eventually acquire the sublease to the three properties.

from the Tanaha partnership bank account and converted the money into cashier's checks in his own name. On May 17 White demanded and received another $5,000 from Santana, as part of the $6,250 Santana had agreed to contribute upon request. A day or two later, White left Sapulpa with the $9,500 in cashier's checks, Santana's $5,000 contribution, and Tanaha partnership equipment, including a truck and welder. On May 23 White cashed the checks at a bank near Houston, Texas. Young, Santana, and the other Tanaha partners did not hear from or see White until his arrest in February 1980.

We believe that the jury could reasonably have found that White knowingly made at least two material misrepresentations to induce the Tanaha partners to invest. First, the jury could have found White had misrepresented his interest in the Bruce, Harjoche, and Walker properties. The jury could have found that on January 18, 1978, White had assigned any interest he had in these properties to Maligaya; and that in late February White had knowingly misrepresented his interest in those properties when he told the Tanaha group he had acquired Maligaya's oil drilling and reworking rights.[8]

Second, the jury could have found White had knowingly misrepresented to the Tanaha group that he had used a steam recovery method to rework a well on the Richart lease. Government witness James Bennett testified that Bennett reworked the Richart well and White only observed. As for this misrepresentation's materiality, two Tanaha partners testified that White's actual

experience in reworking an oil well had been crucial in their decision to invest.

Closer questions are whether the jury could reasonably have found White had knowingly misrepresented that he would use his best efforts to rework some oil wells and would drill a new well using a rig White could borrow from Thomas Bennett. Although White spent two and one-half months in Sapulpa purchasing and building equipment he could use to rework wells, he never actually reworked or drilled any wells. Moreover, when White left Sapulpa, he took with him some of the purchased equipment. From this evidence the jury might have inferred White had purchased and built the equipment for his own purposes, rather than for Tanaha's. The jury also could have found White had knowingly misrepresented that he would fulfill the requirement to drill a new well on the Bruce tract at a cost of only about $7,500 by borrowing a drilling rig from Thomas Bennett. Thomas Bennett apparently did not own a drilling rig that White could borrow, and nothing in the record suggests White believed Thomas Bennett had a rig.[9]

Our review of the record convinces us that the trial judge, in granting the post-verdict judgment of acquittal, must have believed that because White had spent approximately three months in Sapulpa working on the trailer and talking with James Bennett about plans for reworking the wells, a reasonable jury should have a reasonable doubt whether White had formed a scheme to defraud investors. The law is clear, however, that even if a defendant charged with fraud believed the business plan would ultimately succeed, that

8. Even if the jury members had believed White's testimony that on January 18 Jose Santana had assigned Maligaya's interest to White, they nevertheless could have found White had misrepresented his oil drilling interest to the Tanaha group. The jury could have relied on White's own admission at trial that he had not recorded the document assigning Maligaya's interest to White because, believing Santana either was not a Maligaya employee or, if an employee, did not have the authority to make the assignment, he did not consider the assignment legally binding on Maligaya.

9. The record provides some support for this conclusion. Instead of borrowing a rig from the Bennetts, White convinced them to make a down payment of $4,000 on a rig that would have cost the Tanaha partners $78,000. White never told the Tanaha partners that he intended to purchase this rig or that the partnership needed to purchase one. In light of the cost of a rig, White's misrepresentation that the partnership could borrow a rig can be considered material.

belief would not justify false or baseless representations. *E.g., United States v. Themy*, 624 F.2d 963, 965 (10th Cir. 1980); *United States v. Diamond*, 430 F.2d 688, 691–92 (5th Cir. 1970); *Sparrow v. United States*, 402 F.2d 826, 828 (10th Cir. 1968). Further, even if the jury had doubted whether White made some of the alleged misrepresentations with the requisite intent, the government need not prove every allegation of fraud; proof of one or more is sufficient to support a guilty verdict. *E.g., United States v. Beecroft*, 608 F.2d 753, 757 (9th Cir. 1979). We believe that based on the evidence, a jury could reasonably infer that White made material false misrepresentations to these investors pursuant to a plan to obtain money from them. Therefore, the jury's verdict on count one was justified.

■ Having found that White had fraudulently obtained money from the Tanaha partners, the jury could reasonably have reached a guilty verdict on count two: that White had transported in interstate commerce more than $5,000, while knowing the money had been taken by fraud. The government's evidence was uncontroverted that some time after May 17, White travelled from Sapulpa, Oklahoma, to Houston, Texas, with $9,500 from the Tanaha partnership, money he admitted converting to his own use.

The district court's judgment of acquittal is reversed. We remand this case to the district court to reinstate the jury's verdict and to conduct sentencing proceedings.