51 F.3d 287
 NOTICE: Although citation of unpublished opinions remains unfavored, unpublished opinions may now be cited if the opinion has persuasive value on a material issue, and a copy is attached to the citing document or, if cited in oral argument, copies are furnished to the Court and all parties. See General Order of November 29, 1993, suspending 10th Cir. Rule 36.3 until December 31, 1995, or further order.
 UNITED STATES of America, Plaintiff-Appellant,
v.
MARKETING WAREHOUSE, INC., et al., Defendant,
and
Sigfredo Gary GURULE, aka Gary Stewart; Jason A. Rackley,
aka Tim Jones; Michael Christian Moosman, aka
Mike Mosley Mike; Keith Wiseman, aka
Brad Johnson, Defendants-Appellees.
 No. 94-4011.
 United States Court of Appeals, Tenth Circuit.
 Mar. 23, 1995.
 
 1
 Before SEYMOUR, Chief Judge, McWILLIAMS, Senior Circuit Judge and CROW, District Judge.[2]
 
 
 2
 Sigfredo Gary Gurule, Jason Rackley, Michael Christian Moosman and Keith Wiseman in a joint trial were all convicted by a jury of one count of wire fraud in violation of 18 U.S.C. 1343.[3] After the verdicts were received by the district court, the four defendants, through their respective counsel, renewed their motions for judgment of acquittal, pursuant to Fed.R.Crim.P. 29(c). Without oral argument, or briefing, the district court granted these motions on the basis that "the evidence presented by the United States [was] insufficient to sustain the verdicts of guilty on the wire fraud offenses charged in the indictment."[4] In accord therewith, the four guilty verdicts were set aside, and a judgment of acquittal was entered on behalf of each of the four defendants. The United States appeals the judgments thus entered. We reverse and remand with directions that the verdict of guilty of wire fraud as to each defendant be reinstated.
 
 
 3
 The four appellees, who will be referred to as the defendants, were employed as salesmen by Marketing Warehouse, Inc., a telemarketing company located in Murray, Utah. Beverly Brown and Richard Lockwood were the owners and operators of Marketing Warehouse. They were also charged with a variety of criminal charges, and eventually pled guilty, pursuant to a plea agreement, to conspiracy.
 
 
 4
 On appeal, defendants concede, in effect, that Marketing Warehouse, and Brown and Lockwood, were guilty of various crimes stemming from the operation of Marketing Warehouse. The basic position of all defendants is that none of them, however, knew of any criminal activity and most certainly did not knowingly participate therein. As indicated, the district court agreed with the defendants and granted their motions for judgment of acquittal. Some background facts are in order.
 
 
 5
 From about October 1990 through September 1991, the four defendants worked as salesmen for Marketing Warehouse, Inc. Using "lead" lists which had been purchased from lead list brokers, the four defendants, and other employees, would telephone potential customers and use a "sales pitch" given them by Brown and Lockwood. The gist of the pitch was that the recipient of the phone call was advised that he, or she, was one of a few who had won a valuable prize in a national contest worth up to $25,000, but that before they could receive any prize they had to buy from Marketing Warehouse a quantity of bumper stickers reading, "SAY NO TO DRUGS." Marketing Warehouse salespeople who used these lists and made the initial contact with a customer were known as "dialers" or "fronters." As indicated, in talking to a customer, a dialer followed the format set out in the written "pitch sheet," i.e. that the customer had already won a valuable prize and all they had to do to get the prize was to buy the bumper stickers, 150 stickers costing $478, 300 costing $957 and 500 costing $1,595. The dialers would tell the customer of the five prizes available in the contest. The dialer then would often state that two of those prizes had already been claimed, so that the "worst" the customer could do was win a $1,500 government bond. The dialers indicated they did not know which of the three remaining prizes the customer had won because the names of the winners had been randomly matched with certificates entitling them to one of the three prizes. Those certificates were then placed in sealed envelopes.
 
 
 6
 If a customer appeared interested, the dialer handed the phone to a "closer," who confirmed the information provided by the dialer and attempted to "close" the deal and persuade the customer to send money to Marketing Warehouse for the bumper stickers. The four defendants had initially operated as "dialers," but later were promoted to the position of "closers." The four defendants and others worked in a so-called "boiler room" consisting of 15 to 20 dialers and four closers per shift. Each dialer called over a hundred potential customers per shift, and, as indicated, all were advised that he, or she, was already a winner of one of five prizes. Wiseman stated to the FBI agents that he and his group closed up to 44 sales in a morning shift. Rackley testified that he closed an average of 15 to 20 sales a day. Gurule testified that he closed between 7 and 25 sales a day, and Moosman stated to the undercover FBI agents that on a good day he closed between 10 and 15 sales.
 
 
 7
 Defendant Gurule was convicted on count 8 of the indictment charging a wire fraud communication with one Vita Arsenault, a resident of Blind River, Ontario, Canada. At trial Ms. Arsenault testified that she received a telephone call from Marketing Warehouse by a person who identified himself as "Gary Stewart" who, in her case, was the "closer." Gurule admitted at trial that he had used the "telephone name" of Gary Stewart.
 
 
 8
 Defendant Rackley was convicted on count 4 of the indictment charging a wire fraud communication with one Wolfgang Heller, a resident of Vancouver, British Columbia, Canada. At trial Heller testified that he was contacted by a woman from Marketing Warehouse, who told him he had won the "sweepstakes," and he was later turned over to a "closer" who identified himself as "Tim Jones." Jason Rackley admitted that he used the "telephone name" of "Tim Jones."
 
 
 9
 Defendant Wiseman was convicted on count 6 of the indictment charging a wire fraud communication with one Jean Cawthorpe, a resident of Saint Thomas, Ontario, Canada. At trial, Ms. Cawthorpe testified that she received a call from Marketing Warehouse by one who identified himself as "Brad Johnson." At trial, Wiseman admitted he used the "telephone name" of "Brad Johnson."
 
 
 10
 Defendant Moosman was convicted on count 15 of the indictment charging a wire fraud communication with one Virginia Tamblyn-Dolar, a resident of Brampton, Ontario, Canada. At trial, Ms. Tamblyn-Dolar testified that she received a telephone call from Marketing Warehouse and was told she had won a prize and was later turned over to a man who identified himself as "Michael Mosley." The evidence was that Michael Moosman used the "telephone name" of "Michael Mosley."
 
 
 11
 All four of these so-called "customer/victims" were advised that they had won a valuable prize, but would have to buy bumper stickers before they would get the prize. Ms. Arsenault and Wolfgang Heller each sent Marketing Warehouse a check for $638 for bumper stockers. Ms. Cawthorpe sent Marketing Warehouse a check for $319 for her bumper stickers. Ms. Tamblyn-Dolar sent Marketing Warehouse a check for $957 for her bumper stickers. In each of these four instances the "customer/victim" received no prize or bumper stickers.
 
 
 12
 Without detailing all of the evidence, we would note that this was a lengthy trial lasting nearly three weeks. The government called some 16 witnesses, including several "victims" in addition to the four above mentioned, as well as several FBI agents who had conducted a "sting-type" operation involving Marketing Warehouse and its employees, including these four defendants.[5] The defense, in turn, called some 23 witnesses, including the four defendants, certain of their relatives and numerous character witnesses. As indicated, the gist of the testimony of each defendant was that he simply did not realize he was, in fact, participating in any scheme to defraud.
 
 
 13
 At the conclusion of the government's evidence, counsel for the four defendants moved for judgment of acquittal based on Fed.R.Crim.P. 29(a). Those motions were denied, the district court commenting that the government had presented a prima facie case against the four. These motions were renewed at the conclusion of all the evidence and were either denied or reserved for consideration after the jury returned its verdict. In any event, the case was submitted to the jury, who, as indicated, convicted each of the four defendants on one count of wire fraud and acquitted them on all other counts.
 
 
 14
 In granting the post-trial motions for judgment of acquittal under Fed.R.Crim.P. 29(c), the district court stated that the evidence was insufficient to support the guilty verdicts returned by the jury. In colloquy between court and counsel preceding the court's formal ruling on the motions, the district court expressed concern that the government had spent too much time and money going after so-called "green peas," i.e. the four defendants, when it was the higher-ups, i.e. Brown and Lockwood, and possibly others, who were the real culprits.
 
 
 15
 In our view, the record, viewed in a light most favorable to the government, supports the verdicts of the jury as to each of the four defendants. As indicated, it is conceded that at least Marketing Warehouse, Brown and Lockwood were guilty of, among other crimes, wire fraud. It is undisputed that the four defendants participated in the perpetration of such wire fraud. Their only defense at trial was that they did not "know" they were participating in any scheme to defraud in violation of the wire fraud statute. In this connection, the jury was instructed that an essential element of a wire fraud charge was that a particular defendant "knowingly, willfully and with an intent to defraud" participated in a scheme to defraud. There was no objection to this instruction. The jury was further instructed that such "required knowledge" is established if the defendant "was aware of a high probability of the existence of the fact in question, and consciously avoided acquiring knowledge of that fact." As far as we can tell from the record before us, counsel did not object to that particular instruction, and the propriety of such is not raised on appeal.
 
 
 16
 Whether the four defendants, or any of them, had "guilty knowledge" was a fact question. That the defendants denied having guilty knowledge does not end the matter. "Guilty knowledge" on the part of a defendant is usually proven by circumstantial evidence. In this regard, we note that the defendants apparently advised everyone they called that he or she was one of a few who was a "winner." Certainly the defendants could not have believed that each of the customers called had an equal chance of winning either the bond, the cashier's check, or the Lincoln Town car. In any event, in our view, when all of the facts and circumstances are considered, the evidence does support the guilty verdicts returned by the jury on one count of wire fraud by each defendant.
 
 
 17
 In support of our resolution of the present controversy, see United States v. Drake, 932 F.2d 861 (10th Cir.1991); United States v. White, 673 F.2d 299 (10th Cir.1982); and United States v. Krohn, 573 F.2d 1382 (10th Cir.), cert. denied, 436 U.S. 949 (1978). See also United States v. McCollum, 802 F.2d 344 (9th Cir.1986); and United States v. Cusino, 694 F.2d 185 (9th Cir.1982), cert. denied, 461 U.S. 932 (1983).
 
 
 18
 In White, we reversed a district court which had granted a post-trial motion for judgment of acquittal after a jury had convicted the defendant of mail fraud. In so doing, we stated that a post-trial motion for judgment of acquittal should be granted "only if the evidence that [the] defendant committed the crime is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." White, 673 F.2d at 301 (emphasis added). In our view, the jury in the instant case acted "reasonably," and not "unreasonably."
 
 
 19
 We reject counsel's suggestion that United States v. Pearlstein, 576 F.2d 531 (3d Cir.1978) is on all fours with the instant one. There the Third Circuit held that none of the promotional materials was so "patently false" or "grossly exaggerated" that the salesmen "should have been on notice of their dubious nature." Id. at 543. In our view, that is not the present situation.[6]
 
 
 20
 Judgment reversed and case remanded with direction that the district court reinstate the guilty verdicts returned by the jury as to each of the four defendants here involved.
 
 
 
 [1]
 This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of the court's General Order filed November 29, 1993. 151 F.R.D. 470
 
 
 [2]
 Honorable Sam A. Crow, United States District Judge, District of Kansas, sitting by designation
 
 
 [3]
 These four defendants were acquitted on a conspiracy charge, several mail fraud charges and all other wire fraud charges, except the one wire fraud charge upon which each was convicted. At trial, there were two additional defendants, one of whom, Sue Gallegos, was acquitted on all counts. The sixth defendant, Patty Keene, was convicted on one count of wire fraud
 
 
 [4]
 Without any particular explanation, the district court at the same time denied the motion for judgment of acquittal filed by Patty Keene. She has not appealed her conviction
 
 
 [5]
 In late 1990, the Federal Bureau of Investigation initiated an undercover investigation of Marketing Warehouse. FBI agents posed as employees of a fictitious company, called Sunbelt Diversified, which offered a one-of-a-kind autodialing system to telemarketing companies. The system was designed to greatly increase telemarketer's profits. In early January 1991, these agents contacted Marketing Warehouse and arranged to meet with its owner and others, including these defendants. During the meeting the four defendants told the undercover agents how they talked people into sending money to Marketing Warehouse. Each of these meetings was recorded by the undercover agents and the tapes were admitted into evidence at trial
 
 
 [6]
 We reject any suggestion by Moosman that there was a fatal variance between the charge in count 15 of the indictment of which he was convicted and the evidence concerning the date of his telephone conversation with Ms. Tamblyn-Dolar. In United States v. Allen, 554 F.2d 398, 408 (10th Cir.), cert. denied, 434 U.S. 836 (1977), we held that time was not an essential element in a mail fraud case, and that ordinarily proof of acts within the applicable statute of limitations and before the return of the indictment is sufficient