**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**NOV 15 2002**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

    Plaintiff - Appellant,

v.

VIRGIL BROWN and JAMES YAZZIE,

    Defendants - Appellees.

No. 02-2038
(D.C. No. CR-01-174 JP)
(District of New Mexico)

---

**ORDER AND JUDGMENT**[*]

---

Before **SEYMOUR, HOLLOWAY** and **ANDERSON**, Circuit Judges

---

**I**

**A**

The government appeals from the district court's January 3, 2002 order, which

granted the defendants/appellees' motion for judgment of acquittal subsequent to a jury

verdict finding the defendants guilty of assault resulting in serious bodily injury. The

---

[*]This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. This court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

district court had jurisdiction pursuant to 18 U.S.C. § 3231; 18 U.S.C. § 1153 (a) ("Any Indian who commits against the person of another Indian or other person . . . assault resulting in serious bodily injury (as defined in section 135 of this title) . . . within the Indian country, shall be subject to the same law and penalties as all other persons committing any of the above offenses, within the exclusive jurisdiction of the United States."); 18 U.S.C. § 2; 18 U.S.C. § 113.  This court has jurisdiction pursuant to 18 U.S.C. § 3731.  *United States v. Quarry*, 576 F.2d 830, 832-33 (10th Cir. 1978); *United States v Calloway*, 562 F.2d 615, 617 (10th Cir. 1977).

**B**

*Testimony Concerning the Victim, Leroy Thompson*

Leroy Thompson is a member of the Navajo Nation and the Native American Church.  Direct Examination of Leroy Thompson, II App. 286 *et seq.*  He was a "road man" for the Native American Church and a medicine man for the traditional Navajo religion, who conducted prayer services for people who were ill or who had mental health problems.  *Id.* at 288-89.  He has lived in Thoreau, New Mexico, on the Navajo Reservation for all forty-four years of his life.  *Id*. at 287.

Early on the morning of October 30, 2000, Leroy Thompson and two relatives of Thompson's met up with defendants Virgil Brown and James Yazzie at the Distant Drum bar, five miles outside of Thoreau. Direct Examination of Thompson, II App. 293-94. Thompson, the victim, testified at trial that he had been drinking whiskey for four days

before October 30.  *Id.* at 290.  In addition, Thompson admitted that he ate an undermined amount of peyote a week before he began this drinking.  *Id.* at 361.  On October 30, Thompson shared one and one-half pints of vodka with two companions and another friend joined them and gave them some beer.  *Id.* at 337.  Thompson denied being drunk that day but admitted being "intoxicated."  *Id.* at 338.

Thompson testified that he had known both defendants through the Native American Church. *Id. at* 287-88.  Thompson also stated that Yazzie, who knew he was a road man in the Native American Church, began asking Thompson to do a prayer for him.  Thompson refused because they all had been drinking alcohol.  *Id.* at 296-97.  Subsequently, Yazzie, according to Thompson, asked him to join Yazzie, Brown, and Yazzie's sister Bessie Charley for a ride in a pickup truck.  *Id.* at 297-98.  Thompson testified that Brown started to harass him verbally by calling him a "show-off."  They drove down a road and parked a little way up in the hills.  *Id.* at 301.  Thompson testified that he, Brown and Yazzie got off the pickup, II App. 301.  The verbal harassment escalated into a physical assault.  Thompson said  that Yazzie and Brown, who were still drinking beer, stood on either side of him.  *Id*. at 302.  Brown began to punch Thompson on the left side of his face, striking him at least three times.  *Id.* at 302   Yazzie began to push Thompson.  *Id.*  Thompson testified that at this point he started to run away from his assailants past the truck, but Yazzie caught him by the collar of his jacket.  *Id.* at 302-03.  Brown caught up with them and helped Yazzie.  Thompson testified "They take me back

- 3 -

where they break my leg." *Id.* at 303. Thompson said that Brown then threatened "to take the whole clothes off of [Thompson] and let [him] go naked" if he tried to run away again. *Id.*

Brown, according to Thompson, punched him again as Brown and Yazzie continued to verbally abuse him. *Id.* Thompson made another attempt to run away, but Yazzie grabbed him by the hair on the back of his head and threw him down. *Id.* at 304. Thompson testified that after he got back on his feet, he returned to where he had been standing and looked away from Brown and Yazzie, thinking that they would calm down. *Id.* at 304.

Thompson testified that Yazzie was standing on one side and Brown on another. He said that then he felt punches and then felt a force press him, a "force push." *Id.* at 305. Thompson said this happened fast and that he hit the ground hard on his chest and part of his face and that he really did not remember because he had been "dazed." *Id.* at 304. At this time, Thompson said he thought of defending himself and jumped back up fast to use a stick. That was when he said "I stick my bone into the ground and that's when I notice that my leg was broken so I just fell back down." *Id.* at 306. He said that when he tried to stand up he "noticed that [his] leg and [his] ankle was broken. So I just fell back down." He said he really did not remember because he was "in a daze." When he fell back down, Thompson testified that he looked at his foot and on one side of his foot, his bone was sticking out. *Id.* at 307.

Thompson testified further that he crawled from a mattress he had found back to the road and that this took 3 to 4 hours. At the road he waved to a car which was coming and in one vehicle his daughter appeared and stopped. *Id.* at 309. An ambulance was called at this location. *Id.* at 309.

Later in the trial Thompson was questioned again about the breaking of his leg. He described again Brown standing by him and Yazzie on another side. He said he felt "a punch, a hit in the face. And I felt a force pushed on my back. . . . ." *Id.* at 330. Thompson said this happened so fast that he fell down and could not stand with his leg and then noticed that his bone was sticking out. *Id.* at 330-31. During this portion of his testimony Thompson said he had been drinking for some 4 days but not on the day of the injury. *Id.* at 335. He nevertheless admitted he was "intoxicated" on October 30 when his leg was injured. *Id.* at 338.

A further witness to the assault on Thompson was Bessie Charley. II App. at 216 *et seq*. She testified she knew Virgil Brown who is from her "clan family" and she called him her "son." *Id.* at 218. She said James Yazzie was her "little brother." *Id.* She said she didn't know Leroy Thompson before October 30, 2000, but that was the day she got to know him.

On October 30 James Yazzie came in the morning and had been drinking and Bessie Charley had also. Id. at 219-220. Virgil Brown, Yazzie and Charley went to the "Distant Drum" bar. They were in Brown's vehicle. At the bar Thompson came out. He

had a conversation with Bessie Charley's brother, Yazzie. Charley was questioned at trial about her grand jury testimony and said she had "been forced" at the time of that testimony. *Id.* at 223. They left the bar in Virgil Brown's truck – Brown, Yazzie, Thompson and Charley. *Id.* at 225.

They talked about Thompson being a "road man" in Navajo religious terms. Yazzie asked Thompson in the truck to "give him a blessing." *Id.* at 226. The group went to a cliff and the three men got out and stood by the side of the truck and conversed. Charley could only hear part of the conversation. II App. at 227. She heard talk about the "road" man and "peyote stuff."

Charley testified at the trial that no one touched Thompson, *Id.* at 228, but also admitted she had testified earlier that Virgil Brown pushed Thompson with "both hands on the shoulders." *Id.* at 229. Charley said her brother Yazzie was somewhat upset with Thompson because he did not "perform a blessing" on Yazzie. *Id.* at 230. Thompson did not want to perform a "blessing" on Yazzie because they were intoxicated. Charley admitted in her trial testimony that she had said before the grand jury that Yazzie hit Thompson "with a closed fist" but said she was "scared" at the grand jury proceeding. *Id.* at 233. In her trial testimony Charley said that after this blow, Thompson walked about four feet and then fell. *Id.* at 234.

Bessie Charley testified at trial that after Thompson fell, her brother Yazzie helped Thompson up. Then all the men stood by the truck conversing. Then Virgil Brown hit

- 6 -

Thompson on the cheek, not hard, *id.* at 257-58, and Thompson fell and then was sitting on the ground. *Id.* at 237, 259. In her trial testimony, Ms. Charley said that Brown "Just pushed" Thompson. *Id* at 238. After these exchanges, Thompson was on the ground. II App. 242.

Thompson testified that after his injury he crawled down a dirt road to the highway. *Id.* at 309. He said that when he reached the highway he began hallucinating. However, he managed to wave down a passing van driven by his daughter Celestina. *Id.* Celestina stated at trial that when she saw her father "his foot had been broken and his bone was sticking out, and his foot was just on the side (sic). His whole leg pant (sic) was full of blood." Direct Examination of Celestina Thompson, I App. 106. As she was preparing to put her father in her van, Celestina saw Deputy Sheriff Edmund Yazzie driving by and waved him down. *Id.* at 108. Deputy Yazzie called an ambulance which came and Thompson was placed in it. Celestina testified that later she picked up her mother. They went to the place where Celestina had found her father. Then they followed trails of blood that had been left behind and found a mattress with a lot of blood on it and a sock and shoe with chips of bone in it. *Id.* at 111-12.

Charles Buck, an EMT, took Thompson to the Gallup Indian Medical Center in Gallup, New Mexico. Buck testified at trial that as an EMT he worked for the McKinley County Fire Marshal's office. II App. at 392. Buck testified that they were dispatched after a 2:00 p.m. call, to a man with a broken ankle and on County Road 27 they found a

man lying in a ditch. He had an obvious compound fracture of the right leg "with his tib . . . ." *Id.* at 391, 396. The man had a blood-soaked pant leg and his complete foot and ankle were covered with dried blood and dirt. *Id.* at 404. Buck spoke with Thompson as he loaded him onto the ambulance and Thompson "changed his story a few times . . . told me that he had fallen in a hole. And then told me that he was running and stepped in a hole and that he was being chased at one point." *Id.* at 392.

According to Buck, Thompson denied being assaulted or beaten up. *Id.* at 394. However, Buck at trial said that he did not know whether Thompson understood the meaning of "assault" so he asked Thompson if he had been beaten up or in a fight. *Id.* at 407-08. Buck noted in his report that he was unsure how Thompson received his injury because Buck was getting conflicting statements from Thompson, his daughter, and Andrew Begay, Buck's co-worker. *Id.* at 406. Buck acknowledged that it was not unusual for people he treated who had been involved in "any kind of assault" to give different stories about how they sustained their injuries. II App. 408-09.

Buck testified at trial that Thompson had a severe injury, was in a great deal of pain, was weak from loss of blood, and was speaking to others at the scene in Navajo, which Buck did not understand. *Id.* at 403-06. Although Buck didn't notice a cut on Thompson's nose or his black eye when he was treating him, he stated that they could have shown up later and because they weren't life threatening, he wouldn't have mentioned them in his report. *Id.* at 407-08.

Dr. Jay Peter Frechette, an orthopedic surgeon at the Gallup Indian Medical Center, treated Thompson at the emergency room. Direct Examination of Dr. Jay Peter Frechette, I App. 182-85. Frechette testified that Thompson's tibia bone, the major bone in the lower leg, protruded probably two inches beyond the skin. Thompson had "a fracture of the . . . medial part of that tibia . . . so a whole part of that was missing. The ankle is like a saddle, so the medial part of that leg was totally off and his ankle was displaced 100 percent to the right side. And the bone then was covered with, I would say, sand and gravel." *Id.* at 186. He found the injury to be "quite severe but still salvageable." *Id.* at 187.

When Frechette was examining Thompson, Thompson told him that he had fallen in a ditch. *Id.* at 186. Thompson had alcohol on his breath and his blood alcohol level was .236% which Frechette acknowledged as being high. *Id.* at 193. Frechette didn't have much recollection of Thompson's condition other than "he was not thinking clearly and his ankle was protruding through the skin." *Id.* at 198.

Frechette operated on Thompson after examining him in the emergency room. He testified that Thompson had lost significant range of motion. *Id.* He also thought that Thompson might possibly develop arthritis in his ankle and would have an increased risk of reinjury due to the scarring, and weakness of the ankle. The doctor said that Thompson's prognosis for total recovery was very poor. *Id.* at 192. At the time of trial, Thompson testified that it was hard to walk or stand on his ankle long, that he could not

- 9 -

carry heavy items on his right side, and that he walked with a limp.  II App. 320.

## II

Virgil Brown and James Yazzie, defendants/appellees, were indicted by a grand jury on February 13, 2001 and charged with knowingly assaulting Leroy Thompson in Indian Country, which assault resulted in serious bodily injury, in violation of 18 U.S.C. §§ 2, 113(a)(6), and 1153. Grand Jury Indictment, I App. 8.

On July 23, 2001, the jury trial began.  At the close of the Government's case, and again at the close of the defendants' case, the defendants moved for a judgment of acquittal under Rule 29 of the Federal Rules of Criminal Procedure.  District Court Opinion and Order, I App. 76.  The district court reserved decision on the defendants' motion and submitted the case to the jury.  *Id.*  In addition to instructing the jury on the charge of assault resulting in serious bodily injury, the district court provided instructions for the lesser included offenses of assault by striking, beating, or wounding, under 18 U.S.C. § 113(a)(4), and simple assault, under 18 U.S.C. § 113(a)(5).  District Court Opinion and Order, I App. 76.  The jury found both Brown and Yazzie guilty of assault resulting in serious bodily injury.

The defendants filed a post-trial brief in support of their Rule 29 motion in which they admitted that there was evidence sufficient to convict them of assault by striking, beating or wounding in violation of 18 U.S.C. § 113(4) and of simple assault in violation of 18 U.S.C. § 113(5).  Brief in Support of Defendants' Rule 29 Motion for Judgment of

Acquittal, I App. 45, 53. The government filed a brief opposing the defendants' motion but agreed that if the district court granted the Rule 29 motion, it could enter judgment on the lesser included offense. Government's Response to Defendants' Brief in Support of Rule 29 Motion for Judgment of Acquittal, I App. 73.

On January 3, 2002, the district court granted both defendants' motion for judgment of acquittal as to the charge of assault resulting in serious bodily injury. It entered judgments convicting them of the lesser included offense of assault by striking, beating or wounding pursuant to 18 U.S.C. § 113(a)(4). District Court Memorandum and Order, I App. 76-82.

The defendants contended that the government had failed to meet its burden of proof as to whether defendants' assault on Thompson caused his serious bodily injury. The court noted that causation in criminal law has two requirements: cause in fact and proximate cause. *Id.* at 78 (quoting *U.S. v. Mendoza*, 244 F.3d 1037, 1045 (9th Cir. 2001)). However, the court concentrated on the question of cause in fact because this is the element the defendants focused on. Defendants maintained that "[e]ven viewed in the light most favorable to the verdict, none of the evidence at trial showed how Mr. Thompson broke his leg." District Court's Memorandum and Order, I App. 78.

The court instructed the jury that "you are permitted to draw such reasonable inferences from the testimony . . . as you feel are justified in light of common experience" and that "you may make deductions and reach conclusions which reason and common

sense lead[] you to draw from the facts which have been established by the evidence in the case." *Id.* at 79. The Memorandum and Order identified the main problem in this case as being that the inference at issue – that simply being pushed resulted in an open fracture of the leg – seems to run contrary to common sense and experience. *Id.* at 79.

The district court found that on the issue of causation, the government may have raised a suspicion of guilt, but it fell short of establishing beyond a reasonable doubt that the defendants' actions resulted in Thompson's severe ankle injury. Memorandum and Order, I App. 82.

While the judge said that the evidence did not support the charge of assault resulting in serious bodily injury, he felt it "clearly supported a finding of guilt on the lesser included offense of assault by beating, striking, or wounding." *Id.* The court pointed out that the defendants conceded that the Government introduced evidence sufficient to support a conviction of this lesser offense. The parties, the court stated, agree that upon entering a judgment of acquittal as to the charge of assault resulting in serious bodily injury, the district court may enter a judgment of conviction as to the charge of assault by striking, beating, or wounding. *Id.* (citing *United States v. Dhinsa*, 243 F.3d 635, 674 (2nd Cir. 2001)). The district court therefore entered a judgment of conviction as to both defendants for the lesser offense of assault by striking, beating or wounding.

## III

This Court reviews a district court's decision to grant a motion for judgment of acquittal *de novo*. *See United States v. Jackson*, 213 F.3d 1269, 1283 (10th Cir. 2000). We have previously spelled out the standard of review of a grant of a motion for acquittal: "We must view the evidence, both direct and circumstantial, in the light most favorable to the government, and without weighing conflicting evidence or considering the credibility of witnesses, determine whether that evidence, if believed, would establish each element of the crime." *United States v. White*, 673 F.2d 299, 301-02 (10th Cir. 1982), *United States v. Downen*, 496 F.2d 314, 318 (10th Cir.), *cert. denied*, 419 U.S. 897, 95 S. Ct. 177, 42 L. Ed. 2d 142 (1974); *Goff v. United States*, 446 F.2d 623, 624 (10th Cir. 1971).

Under this standard we recognize the right of the jury to determine credibility and to find the facts. *White*, 673 F.2d at 301. We also permit the district court to enter a judgment of acquittal only if the evidence that defendant committed the crime is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt. *Id.* If the government has met that standard, both this court and the trial court must defer to the jury's verdict of guilty. *Id.* at 302. This standard is based upon a deep respect for the fact-finding function of the jury. *Id.*

The issue here is whether, viewing the evidence in the light most favorable to the verdict, a rational jury could have found that the government proved beyond a reasonable

- 13 -

doubt that the defendants' committed an assault on Thompson which resulted in serious bodily injury in violation of 18 U.S.C. § 1131 (a) (6). Applying the applicable standard of review, we are convinced that the trial judge did not view the evidence, both direct and circumstantial, in the light most favorable to the government without weighing conflicting evidence in determining whether the evidence, if believed, would establish each element of the crime. *United States v. White*, 673 F.2d at 301-02. We feel the judge did not follow the strict rule which permits the court to enter a judgment of acquittal "only if the evidence that defendant committed the crime is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *Id.* at 301. Instead, the district court substituted its judgment of the merits of the case for that of the jury, weighed conflicting testimony from Thompson, and questioned Thompson's credibility as a witness.

The district court's error in the present case springs from its unwillingness to accept the jury's inference that "simply being pushed resulted in an open fracture" of Thompson's lower leg. Memorandum and Order, I App. 79. The district court provided the jury with the instructions that "you are permitted to draw such reasonable inferences from the testimony and exhibits as you feel are justified in the light of common experience" and that "you may make deductions and reach conclusions which reason and common sense [lead] you to draw from the facts which have been established by the evidence in the case." Memorandum and Order, I App. 79. The court found that the

jury's inference that Thompson's broken ankle resulted from being pushed "seems to run contrary to common sense and experience." *Id.* The problem here is that when the court made this finding, it substituted its view of the evidence for that of the jury.

The district court did not follow the proper standard of review when it weighed conflicting testimony from Thompson and in effect called into question Thompson's credibility as a witness. The court challenged Thompson's statement about how his ankle was broken by stating that "[c]ommon experience suggests that some aggravating factor, beyond being simply pushed forward, must account for the severity of this ankle injury." *Id.* Instead, the judge suggests, if the government had presented expert medical testimony explaining that "Mr. Thompson's ankle injury was consistent with falling down in the way he described, it may have allowed a jury to conclude that the causation element had been established beyond a reasonable doubt." *Id.* at 80. Instead the judge seriously questioned Thompson's credibility as a witness.

Moreover, the court weighed conflicts in the testimony of Thompson. It stated that "[c]ompounding the problems relating to the Government's insufficient proof on the issue of causation are the indications that at one time Mr. Thompson believed that he had injured his ankle by falling into a ditch." Memorandum and Order, I App. 80. The court proceeded to compare Thompson's trial testimony regarding how he broke his ankle when falling with other trial testimony. Thompson said that he told Deputy Sheriff Edmund Yazzie on the day of the injury that he had fallen in a ditch. The court pointed out that

Thompson had made similar statements regarding falling in a ditch to Dr. Frechette and Charles Buck, the Emergency Medical Technician. *Id.* at 81. The court acknowledged that the tasks of "weighing conflicting evidence and evaluating witnesses' credibility belong to the jury, not the Court." *Id.* The judge conceded that "the jury appears to have believed the version of events Mr. Thompson offered at trial." *Id.* The judge then said he had pointed "to the variation in Mr. Thompson's descriptions of how he broke his ankle only to compare the extent to which the explanations coincide with common sense and common experience." *Id.*

In questioning Thompson's credibility, weighing his testimony, and suggesting the need for further expert medical opinion, we feel that the judge did not sufficiently accept the jury's findings. We believe that when the evidence is examined in the light most favorable to the verdict, it is clear that there was sufficient evidence for the jury to find the defendants' assault was "the cause in fact" and "the proximate cause" of Thompson's serious bodily injury. Thompson testified that before the assault he was standing, II App. 304, and that after he was knocked down by the defendants he hit the ground hard, noticed his ankle was broken, and fell back down. *Id.* at 305-07. We feel the proof is sufficient for the jury to decide that defendants were the factual cause of Thompson's serious bodily injury.

Testimony from Celestina Thompson, Dr. Frechette, and the EMT Buck combined to support Thompson's testimony. Celestina Thompson testified that she found her father

by the side of the road and later she and her mother followed trails of blood back to the area where Thompson says he was injured. I App. 110. There they found Thompson's bloody sock and shoe with chips of bone in it, a bloody mattress, and some hair that looked like Thompson's hair. *Id.* at 111-12. When Celestina Thompson visited her father at the hospital that evening she saw his nose was cut, he had a black eye and hair was missing from the back of his head. *See id*. at 152-53.

In connection with proximate cause, "the government need only show the defendants' illegal conduct *resulted* in bodily injury; not that the defendants intended bodily injury." *United States v. Woodlee,* 136 F.3d 1399, 1405 (10th Cir.) (emphasis in original), *cert. denied sub nom. Kinslow v. United States*, 525 U.S. 842 (1998). "A fundamental principle of criminal law is that a person is held responsible for all consequences proximately caused by his criminal conduct." *United States v. Guillette*, 547 F.2d 743, 749 (2nd Cir. 1976), *cert. denied*, 434 U.S. 839 (1977). Viewing the evidence here in the light most favorable to the jury's verdict, it may be inferred that the defendants gave Thompson several punches and pushes, II App. 302-06, and that this assault resulted in the serious bodily injury to Thompson.

**IV**

Accordingly, the district court's grant of the defendants's motion for judgment of acquittal is REVERSED and the case is REMANDED to the district court for further

proceedings consistent with this opinion.

ENTERED FOR THE COURT

William J. Holloway, Jr.
Circuit Judge